**PUBLISH**

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **LATSHAW DRILLING, LLC.,** | ) | **Case No.  09-13572-R** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |
| IN RE: | ) | **Case No. 09-13574-R** |
| | ) | **Chapter 11** |
| **LATSHAW DRILLING &** | ) | |
| **EXPLORATION COMPANY,** | ) | |
| **INC.,** | ) | |
| | ) | **Administratively Consolidated** |
| Debtor. | ) | **Under Case No. 09-13572-R** |

**MEMORANDUM OPINION**

**TABLE OF CONTENTS**

I.    JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.   FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.    Prepetition Relationship between Latshaw and LCPI . . . . . . . . . . . . . . 3
      B.    Postpetition Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            1.    *Cash collateral* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            2.    *Latshaw's Claim against LCPI filed in the Lehman Bankruptcy Case*
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.    *LCPI's Proof of Claim filed in Latshaw's bankruptcy case* . . . . . 18
            4.    *Disclosure Statement and Plan Confirmation* . . . . . . . . . . . . . . 20
      C.    Post-Confirmation Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
            1.    *Execution of the Post-Confirmation Implementation Documents* . 27
            2.    *Claims Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                  a.    Pre-confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
                  b.    Post-confirmation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
            3.    *Fees incurred in filing Fee Applications* . . . . . . . . . . . . . . . . . . 37

III.  CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
      A.    Scope of ¶ 9.5(b) of the Prepetition Credit Agreement . . . . . . . . . . . . 43
      B.    Reasonableness Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
            1.    *The bankruptcy case was not complex* . . . . . . . . . . . . . . . . . . . 51

   2. *The number of lawyers assigned to work on this case resulted in substantial duplication of efforts, and no billing judgment was applied.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

   3. *Underutilization of local counsel* . . . . . . . . . . . . . . . . . . . . . . 56

   4. *Unreasonable hourly rates* . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

   5. *Fees are disproportionate to the risk* . . . . . . . . . . . . . . . . . . . . 62

 C. <u>The Unreasonable Portion of Fees and Expenses Will Not Be Allowed as an Unsecured Claim under § 502(b)</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

 D. <u>Allowed Fees</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

   1. *Fees for Prepetition Services* . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    a. Prepetition "Case Administration" Tasks . . . . . . . . . . . . . 66

    b. Prepetition "Credit Agreement" Tasks . . . . . . . . . . . . . . 67

    c. Prepetition "Fee Application" Tasks . . . . . . . . . . . . . . . . 70

   2. *Fees for Postpetition Services* . . . . . . . . . . . . . . . . . . . . . . . . . 70

    a. Postpetition administration of Lehman Bankruptcy Case . . 70

    b. "Case Administration" . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    c. "Cash Collateral" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

    d. "Plan and Disclosure Statement" . . . . . . . . . . . . . . . . . . 78

    e. "Credit Agreement" . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

    f. "Fee Application" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    g. "Non-Working Travel" . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    h. "Claims Litigation" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

   3. *Summary of Allowed Fees* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

 E. <u>Allowed Expenses</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

   1. *LCPI's Out-of-Pocket Expenses* . . . . . . . . . . . . . . . . . . . . . . . . 89

   2. *Weil's Expenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

    a. Travel and Transportation Expenses of $42,121.23 . . . . . . 91

    b. Business Meal Expenses of $3,403.02 . . . . . . . . . . . . . . . 93

    c. Telephone and Facsimile Expenses of $144.31 . . . . . . . . 94

    d. Postage and Express Mail Expenses of $2,162.01 . . . . . . 94

    e. Messenger and Process Service Expenses of $350.79 . . . . 96

    f. Duplicating Expenses of $25,007.44 . . . . . . . . . . . . . . . . 96

    g. Consultants and Witness Fees of $7,664.40 . . . . . . . . . . . 97

    h. Corporation Service Expenses of $1,232.60 . . . . . . . . . . . 98

    i. Court Reporting Expenses of $7,798.35 . . . . . . . . . . . . . . 98

    j. Computerized Research Expenses of $47,532.29 . . . . . . . . 99

   3. *Conner & Winters' Expenses* . . . . . . . . . . . . . . . . . . . . . . . . . . 99

   4. *Summary of Allowed Expenses* . . . . . . . . . . . . . . . . . . . . . . . . 102

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

Before the Court is the Amended Application for Allowance of Claim of Lehman Commercial Paper, Inc. for Interest, Fees, and Expenses Under Section 506(b) of the Bankruptcy Code (Doc. 288) filed on August 17, 2010, by secured creditor Lehman Commercial Paper, Inc. ("LCPI"), as amended and supplemented by LCPI on July 28, 2011 (Doc. 491) (collectively the "Application"); the Objection to Lehman Commercial Paper Inc.'s Application for Allowance of Claim of Lehman Commercial Paper Inc. for Interest, Fees, and Expenses Under Section 506(b) of the Bankruptcy Code (Doc. 301) filed on August 23, 2010, by the Debtors Latshaw Drilling, LLC and Latshaw Drilling & Exploration Company, Inc. (collectively "Latshaw" or the "Latshaw entities"), as supplemented on August 11, 2011 (Doc. 494) (collectively, the "Latshaw Objection"); the United States Trustee's Limited Objection Regarding Lehman Commercial Paper Inc.'s Application for Allowance of Claim for Interest, Fees and Expenses Under Section 506(b) of the Bankruptcy Code (Doc. 307) filed on August 24, 2010, as supplemented on November 25, 2011 (Doc. 499) (collectively, the "UST Objection"); and the Response to Objections to Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. for Interest, Fees, and Expenses Under § 506(b) of the Bankruptcy Code (Doc. 500) filed by LCPI on December 9, 2011 ("LCPI's Response to Objections").

In 2008, LCPI retained Weil Gotshal & Manges LLP ("Weil") to represent it in connection with its dispute with Latshaw concerning their mutual obligations under a $100,000,000 Amended and Restated Credit Agreement dated July 11, 2008 (the "Prepetition

Credit Agreement").[1]  After Latshaw filed its Chapter 11 petition in November 2009, LCPI also retained Conner & Winters to serve as its local counsel in this case.  Because LCPI's claim against Latshaw has at all times been secured by property valued in excess of the amount of LCPI's claim, LCPI seeks reimbursement from Latshaw of its out-of-pocket expenses and attorney fees and expenses in the amount of $2,799,854.02 pursuant to 11 U.S.C. § 506(b) (hereinafter "§ 506(b)") and the terms of the Prepetition Credit Agreement.

LCPI contends that these fees and expenses were reasonably incurred in its "enforcement or preservation of any rights" under the Prepetition Credit Agreement.[2] Latshaw contends LCPI's fees and expenses were not incurred to enforce or preserve rights under the Prepetition Credit Agreement, but rather resulted from LCPI attempting to avoid the consequences of its breach of the Prepetition Credit Agreement.  Latshaw also asserts that because both the Prepetition Credit Agreement and § 506(b) limit reimbursement to "reasonable" fees and expenses, LCPI is not entitled to recover for services and expenses that were unnecessary or redundant, or otherwise not reasonably incurred.

An evidentiary hearing on the Application was held on December 13, 2011, and the matter was taken under advisement.  Upon consideration of the pleadings, evidence presented

---

[1] $100,000,000 Amended and Restated Credit Agreement among Latshaw Drilling Company, LLC, as Borrower, Latshaw Drilling & Exploration Company, The Several Lenders from Time to Time Parties Hereto, Lehman Brothers Inc., as Arranger, Lehman Commercial Paper Inc., as Syndication Agent, and Lehman Commercial Paper Inc., as Administrative Agent Dated as of July 11, 2008 ("Prepetition Credit Agreement"), LCPI Exhibit 1.

[2] Id. at 63, ¶ 9.5(b).

2

at the hearing, prior proceedings occurring in this bankruptcy case and certain orders entered

in LCPI's own Chapter 11 bankruptcy case (administratively consolidated into Bankruptcy

Case No. 08-13555 ( S.D.N.Y.)) (the "Lehman Bankruptcy Case"), of which the Court takes

judicial notice, arguments of counsel, and applicable law, the Court finds and concludes as

follows:

# I.     JURISDICTION

This is a core proceeding as described by 28 U.S.C. § 157(a), (b)(2)(B), and (b)(2)(O).

The Court has jurisdiction of this proceeding by virtue of 28 U.S.C. § 1334, Local Civil Rule

84.1(a) of the United States District Court for the Northern District of Oklahoma, and

retention of jurisdiction provisions contained in the order confirming Latshaw's Chapter 11

plan.[3]

# II.    FINDINGS OF FACT

### A.     Prepetition Relationship between Latshaw and LCPI

Since 1981, Latshaw has successfully operated a business leasing mobile drilling rigs

to the oil and gas industry.  During the time period relevant herein, Latshaw was engaged in

---

[3]See Order Confirming Plan (Doc. 282).  In the Third Amended Joint Chapter 11 Plan
of Reorganization ("Plan"), which is incorporated into the Order Confirming Plan, the Court
retained jurisdiction of, among other matters–

> (a) All causes of action arising under or relating to any provision of the
> [Bankruptcy] Code;
> (b) Determination of any dispute respecting claims; [and]
> (c) Allowance of Administrative Expense Claims and Professional Fee Claims
> or other requests for fees, allowances or reimbursements allowable under the
> Code or the Plan as may be required by the terms of the Plan to be determined
> by this Court[.]

Plan at 49.

a strategy of capital expansion, adding rigs to its fleet.  In 2008, *Inc. Magazine* rated Latshaw 91st on its list of the 500 fastest growing private companies in the United States, and in 2009, Latshaw was ranked 118th of those 500 companies.  As of the date of the trial, Latshaw employed approximately 400 people in Oklahoma and Texas, and generated annual revenue of approximately $80 million.[4]

In 2005, Latshaw owned one rig and had 23 employees.  From 2005 to 2008, Latshaw constructed at least nine additional drilling rigs.  Large public oil and gas companies, such as Chesapeake Energy and XTO Energy, leased Latshaw's rigs to explore natural gas fields as Latshaw's rigs were designed to accommodate horizontal drilling projects.  Latshaw's employees operated the leased rigs.  Construction of the rigs was first financed by a $60 million credit agreement entered into between Latshaw and LCPI.  In 2006, LCPI increased the line of credit to $80 million, on which Latshaw drew $78.5 million.  In 2008, after Latshaw repaid $18.5 million to reduce the balance to approximately $60 million, LCPI agreed to increase Latshaw's borrowing capacity by $40 million (to $100 million) so that Latshaw could erect six more rigs.  On July 11, 2008, the parties entered into the "$100,000,000 Amended and Restated Credit Agreement among Latshaw Drilling Company, LLC, as Borrower, Latshaw Drilling & Exploration Company, The Several Lenders from Time to Time Parties Hereto, Lehman Brothers Inc., as Arranger, Lehman Commercial Paper Inc., as Syndication Agent, and Lehman Commercial Paper Inc., as Administrative Agent

---

[4]Latshaw's business background information was supplied by its president and CEO, Trent B. Latshaw, in the Affidavit of Trent B. Latshaw in Support of Petition and First Day Motions (Doc. 14) ("Latshaw Affidavit"), Latshaw Exhibit 12.

Dated as of July 11, 2008."[5]   The line of credit was secured by the rigs, among other collateral.  On August 26, 2008, Latshaw drew $3 million of the $40 million available credit. From that initial draw, LCPI retained $600,000 as its fee for committing to fund the additional $40 million.

Less than one month later, on September 15, 2008, LCPI's affiliate, Lehman Brothers Holdings Inc. ("LBHI"), and a number of LBHI's subsidiaries and affiliates, filed petitions for relief under Chapter 11 of the Bankruptcy Code in the Southern District of New York. LCPI, however, was not one of the LBHI affiliates that filed on September 15, 2008.

On September 17, 2008, Latshaw submitted to LCPI a written request to draw the remaining $37 million LCPI had committed to fund.[6]   The lender with a twenty-five percent participation interest in the Prepetition Credit Agreement,  Ableco Finance LLC ("Ableco"), advanced its ratable portion of the amount requested directly to Latshaw,[7] but LCPI did not fund the remaining seventy-five percent, thus defaulting on its commitment under the Prepetition Credit Agreement.  On September 23, 2008, Latshaw, through its president, Trent Latshaw, gave LCPI notice of the default and the damage caused thereby, and requested that LCPI advise as to its intention with respect to its funding commitment.[8]   LCPI did not

---

[5]LCPI Exhibit 1.

[6]See Letter dated September 17, 2008, attached as Exhibit B to Latshaw Affidavit, Latshaw Exhibit 12.

[7]See Letter dated September 18, 2008, attached as Exhibit C to Latshaw Affidavit, Latshaw Exhibit 12.

[8]See Letter dated September 23, 2008, attached as Exhibit D to Latshaw Affidavit, Latshaw Exhibit 12.

respond.  On October 3, 2008, Trent Latshaw and Latshaw's counsel both sent letters to LCPI asserting default, and again sought information regarding LCPI's intentions.  Latshaw also demanded a *pro rata* refund of the $600,000 commitment fee, and advised that notwithstanding LCPI's default, Latshaw would continue to make payments on the outstanding debt according to the Prepetition Credit Agreement.[9]  Latshaw did in fact continue to make such payments to LCPI and Ableco.

On October 5, 2008, LCPI filed its petition under Chapter 11 of the Bankruptcy Code in the Southern District of New York.  Latshaw was, of course, then stayed from attempting to enforce its rights against LCPI.  Finally, in December 2008, Eric Salzman, a representative of LCPI, called Trent Latshaw and requested that Latshaw simply release LCPI from its unfunded commitment.  By December 2008, LCPI's default on its commitment had forced Latshaw to cancel building two new rigs it had anticipated putting into service.[10]  Latshaw agreed to release LCPI from its commitment upon certain conditions, but LCPI did not accept the conditions.  LCPI remained in default of the Prepetition Credit Agreement.

In January 2009, LCPI internally confirmed that Latshaw had timely made all payments required by and within the terms of the Prepetition Credit Agreement.[11]  No further

---

[9]See Letters dated October 3, 2008, attached as Exhibits E and F to Latshaw Affidavit, Latshaw Exhibit 12.

[10]Testimony of T. Latshaw, Transcript of Hearing Held on December 13, 2011 ("Tr. 12/13/11") at 117-18.  See also Latshaw Affidavit ¶ 39 (Trent Latshaw asserted that Latshaw was damaged by LCPI's funding default because Latshaw had already taken delivery of over $15 million of equipment to be used to construct the two rigs.  In addition, Latshaw claimed damages for profits it would have earned on three year leases of the two uncompleted rigs.)

[11]See LCPI Internal Email dated January 9, 2009, Latshaw Exhibit 7, as identified by
(continued...)

communication between Latshaw and LCPI occurred until February 13, 2009, when LCPI, now represented by Weil,[12] sent a letter declaring *Latshaw* in default of the Prepetition Credit Agreement on the ground that Latshaw purportedly did not provide LCPI with "bailee agreements" from the owners of real property on which rigs were located.[13]  Latshaw advised LCPI that rigs operated by Latshaw employees were not under the physical custody or control of the surface or mineral owners of the land, and therefore no bailment arose in connection with those rigs.[14]  Latshaw did provide LCPI with a bailee agreement in connection with rigs that were stored in a warehouse.[15]

Then, on May 26, 2009, LCPI advised Latshaw that the financial information Latshaw had been providing to it was not in the form required by the Prepetition Credit Agreement, and further that Latshaw had no right to cure these past technical defaults.  LCPI also contended that Latshaw had failed to maintain a five million dollar key man life insurance

---

[11](...continued)
the Deposition Testimony of Michelle Rosolinsky, LCPI Senior Vice President, Latshaw Exhibit 2, at 90-92.

[12]In LCPI's Application, Weil allocated its services into seven categories: Case Administration, Cash Collateral, Claims Litigation, Credit Agreement, Fee Application, Non-Working Travel, and Plan and Disclosure Statement.  Fees for services in the "Credit Agreement" category begin in December 2008.  See Weil Fees and Expenses, attached as Exhibit A to LCPI's Response to Objections (Doc. 500), at page 69 of 104.  The 104-page list of detailed entries, divided into categories, will hereinafter be referred to as "Weil Fee Detail" and page numbers will refer to the numbered page within that 104-page document.

[13]See Letter dated February 13, 2009, attached as Exhibit G to Latshaw Affidavit, Latshaw Exhibit 12.

[14]See Letters dated February 23, 2009, and February 27, 2009, attached as Exhibits H and I to Latshaw Affidavit, Latshaw Exhibit 12.

[15]Id.

policy as required by the agreement.  Finally, LCPI demanded that Latshaw provide extensive specific financial information and documentation within nine days.[16]

At a meeting held in Tulsa on June 4, 2009, Trent Latshaw advised LCPI's representatives that he had supplied financial information exactly in the manner as instructed by Robert Chambers, the LCPI representative in the Houston office that personally handled the Latshaw account.  LCPI requested permission to contact Latshaw's accounting firm in order to obtain unconsolidated financial statements and other financial information sought by LCPI, which Latshaw granted.  Latshaw also advised LCPI representatives that LCPI had previously expressly waived, in writing, the life insurance policy requirement.

Apparently, the financial information LCPI demanded was not critical to LCPI's evaluation of Latshaw's loan because LCPI did not contact Latshaw's accounting firm to obtain the information.  Instead, on June 17, 2009, LCPI presented to Latshaw– "[a]s a follow up to our meeting . . . on June 4th, 2009"– a proposal to restructure the Prepetition Credit Agreement that "addresse[d] the Lenders' concerns."[17]  In the proposal, LCPI wielded the purported technical defaults as grounds to reduce LCPI's share of the $100,000,000 commitment from $75,000,000 to $45,289,500 (the outstanding balance then due to LCPI), and to require Latshaw to pay an amendment fee of $1,445,000, an increased interest rate, a prepayment of $3,000,000 of the principal at closing, and all of LCPI's and Ableco's accrued

---

[16]See Letter dated May 26, 2009, attached as Exhibit J to Latshaw Affidavit, Latshaw Exhibit 12.

[17]Proposal dated June 17, 2009, attached as Exhibit B to Letter dated July 10, 2009, Latshaw Exhibit 8.

fees and expenses.[18]   In addition, LCPI would acquire warrants for twenty percent of Latshaw's equity, half of which Latshaw could recover if it paid the loan in full within a year.[19] Latshaw would also be required to retain a broker to sell all rigs not yet under contract and obtain LCPI's approval to complete or construct any new rigs.[20]

Because Latshaw was in substantial compliance with the Prepetition Credit Agreement (and LCPI was admittedly in default), Latshaw rejected the proposal to restructure the agreement on these despotic terms.  On July 10, 2009, LCPI again sent a notice detailing purported technical defaults, again claiming a failure to obtain life insurance – a requirement that Latshaw had already demonstrated had been waived by LCPI – and the failure to produce the financial information that LCPI indicated it would obtain directly from the Latshaw's accounting firm.[21]  LCPI also demanded that Latshaw deliver a 13-week cash flow budget by July 15, 2009.[22]

---

[18]Id.

[19]Id.

[20]Id.

[21]Letter dated July 10, 2009, Latshaw Exhibit 8; Email dated June 5, 2009, Latshaw Exhibit 19; Amendment No. 1 and Waiver to Credit Agreement, Latshaw Exhibit 20, at 13, ¶ 3(a) (LCPI waived any current or future default for failure to deliver evidence of key man life insurance).

[22]Letter dated July 10, 2009, Latshaw Exhibit 8.

On July 13, 2009, LCPI swept $5,446,339.41 from Latshaw's operating account and held this sum as additional collateral,[23] notwithstanding the fact that Latshaw was current on its financial obligations under the Prepetition Credit Agreement.

On August 7, 2009, Ableco sent Latshaw a letter demanding payment of approximately $75,000 for legal fees incurred by Ableco's counsel for the period of February 3, 2009, to August 5, 2009 (the period in which LCPI was contriving grounds for default), ostensibly pursuant to ¶ 9.5(b) of the Prepetition Credit Agreement.[24]  In a letter dated August 26, 2009, Latshaw requested that Ableco provide information about the types of services performed in order to assess the reasonableness of the fees demanded,[25] but Ableco never responded.

On September 18, 2009, Latshaw filed a two-page proof of claim in LCPI's bankruptcy case in the amount of $18,090,000 for "unfunded commitment damages."[26]  Because Latshaw was "under compulsion of the bar date" set in the LCPI bankruptcy case, Latshaw filed its

---

[23]See Letter dated July 21, 2009, attached as Exhibit L to Latshaw Affidavit, Latshaw Exhibit 12.

[24]See Letter dated August 26, 2009, attached as an exhibit to Letter dated October 1, 2009, Exhibit O to Latshaw Affidavit, Latshaw Exhibit 12.

[25]Id.   Paragraph 9.5(b) obligated Latshaw to pay only "reasonable fees and disbursements of counsel to each Lender" for "the enforcement or preservation of any rights" under the Prepetition Credit Agreement.  LCPI Exhibit 1 at 63, ¶ 9.5(b).

[26]Judicial notice is taken of the existence of Latshaw's Proof of Claim filed September 18, 2009, attached as Exhibit C to Doc. 6729 filed in the Lehman Bankruptcy Case.  As stated previously, Latshaw sought to reduce its obligation to LCPI because LCPI's funding default prevented Latshaw from completing construction of two additional rigs.

proof of claim as a protective measure in order to avoid potentially waiving its right to hold

LCPI accountable for its breach of the Prepetition Credit Agreement.[27]

On September 29, 2009, LCPI again declared Latshaw to be in default of the

Prepetition Credit Agreement based upon its belief that Latshaw failed to remit $311,458.67

in insurance proceeds to LCPI as required by the Prepetition Credit Agreement.[28]  Latshaw

had deposited those funds into a blocked bank account controlled by LCPI, and Latshaw had

not used or otherwise exercised control over these proceeds of LCPI's collateral.[29]  LCPI also

declared Latshaw in default because it had not yet paid the attorney fees demanded, but not

justified or documented, by Ableco.[30]  Based upon these alleged defaults, LCPI accelerated

the indebtedness, instituted the default interest rate, terminated its commitment, and applied

the funds held by LCPI after sweeping Latshaw's operating account to reduce the debt.[31]  On

September 30, 2009, LCPI again swept Latshaw's bank account, seizing $374,266.53.[32]

---

[27]Id.

[28]See Letter dated September 29, 2009, attached as Exhibit N to Latshaw Affidavit, Latshaw Exhibit 12.

[29]See Letter dated October 1, 2009, attached as Exhibit O to Latshaw Affidavit, Latshaw Exhibit 12.

[30]See Letter dated September 29, 2009, attached as Exhibit N to Latshaw Affidavit, Latshaw Exhibit 12.

[31]Id.

[32]Latshaw Affidavit, Latshaw Exhibit 12, at ¶ 32; Testimony of T. Latshaw, Tr. 12/13/11 at 123-24.

When it became clear to Latshaw that LCPI intended to foreclose on its drilling rigs, a move that would have destroyed Latshaw's thriving and lucrative business and put 400 employees out of work, Latshaw filed this bankruptcy case.[33]

The Court has never seen any evidence, throughout this case, that Latshaw lacked the means to repay LCPI.  Rather than negotiating minor concessions to compensate Latshaw for LCPI's admitted default at the time LCPI sought a release of its unfunded commitment in December 2008 (for example, refunding the *pro rata* portion of the $600,000 commitment fee, for which Latshaw received nothing), LCPI made the strategic decision to search for non-financial defaults as leverage, and then attempted to extort another round of transaction fees and increased interest on funds Latshaw had already borrowed and was faithfully repaying, and to demand warrants for twenty percent of Latshaw's equity.

When Latshaw refused to be bullied into restructuring the loan, LCPI seized over $5 million of Latshaw's operating funds to hold as additional collateral, and searched for additional leverage to force Latshaw to renegotiate the agreement that LCPI breached. Ultimately, by accelerating this performing loan on technical grounds, LCPI drove Latshaw into bankruptcy court.

There is no question that but for LCPI's own financial failure,[34] and its unsuccessful attempt to intimidate Latshaw into surrendering its rights under the Prepetition Credit Agreement, Latshaw's bankruptcy would not have occurred.  LCPI's tactics escalated the

---

[33]Testimony of T. Latshaw, Tr. 12/13/11 at 125-29.

[34] It is not a stretch to infer that Latshaw's inability to obtain take-out financing to resolve the standoff with LCPI was directly attributable to the Lehman entities' failure, which, as is well known, paralyzed financial markets for years.

disputes between it and Latshaw and exacerbated the amount of attorney fees and expenses that LCPI seeks to tack onto Latshaw's secured debt.  Latshaw's expert witness aptly characterized LCPI's expenditure of legal fees and expenses as the consequence of a "self-inflicted gunshot wound."[35]

LCPI requests reimbursement from Latshaw of approximately $125,000.00 for fees it incurred from December 2008 to the date Latshaw filed its Chapter 11 petition.

B.    Postpetition Events

On November 11, 2009 (the "Petition Date"), the two Latshaw entities that were parties to the Prepetition Credit Agreement filed petitions for relief under Chapter 11 of the Bankruptcy Code.  The two cases were jointly administered.  For the purpose of determining whether LCPI acted to protect its interests during Latshaw's bankruptcy case in a fair, efficient, and prudent manner and with reasonable restraint, the Court makes the following findings to recount the course of Latshaw's Chapter 11 case and the extent of LCPI's participation in each significant event, as reflected by the pleadings that were filed and its counsel's time and billing records.

1.    *Cash collateral*

On November 18, 2009, the Court held a preliminary hearing in connection with Latshaw's request to use cash and receivables in which LCPI and Ableco had a security interest.  Latshaw contended that its debt to LCPI and Ableco (totaling approximately $69 million) was secured by collateral with a going-concern value of $193 million and a liquidation value of in excess of $100 million.  Although LCPI was in possession of a recent

---

[35]Testimony of N. Tomlins, Tr. 12/13/11 at 163, 170-71.

13

appraisal by an independent third party, Hadco International ("Hadco"), which confirmed those figures, LCPI would not concede that it was vastly oversecured.[36]  At that early hearing, Latshaw also disclosed its intent to propose a plan that would pay all allowed claims of creditors in full.[37]

An agreed interim cash collateral order providing for Latshaw's use of cash for three weeks was entered.  The order submitted by the parties contained standard boilerplate language and standard adequate protection provisions, and anticipated that the terms of the order (other than the budget) would govern the use of collateral until at least January 12, 2010.[38]

On December 2, 2009, a final cash collateral hearing was held, and a final agreed order governing the period through January 12, 2010, was entered.[39]  No one contested the validity

---

[36]LCPI's internal profile of the Latshaw loan acknowledged that sometime in the first quarter of 2009, Hadco placed a forced liquidation value of just the rigs at $92.1 million.  See Quarterly Valuation as of 12/31/08, Latshaw Exhibit 6, at 3, as identified by deposition testimony of Howard Liao, Latshaw Exhibit 3, at 84-88.  LCPI disregarded the Hadco appraisal for the purpose of valuing the loan due to the distressed state of the market, and reduced the liquidation value of the rigs by almost 60 percent, to $39 million.  LCPI's internal summary confirmed, however, that Latshaw was a thriving going concern, was well able to service its debt, and had not only survived the volatility that plagued the petroleum industry in 2008, but also had in fact posted a ten percent increase in revenue.  Significantly, none of the notices of default sent to Latshaw during 2009 indicated that LCPI determined itself insecure.

[37]See Plan Term Sheet dated November 11, 2009, attached as Exhibit A to Latshaw Affidavit, Latshaw Exhibit 12.

[38]Interim Order Authorizing Use of Cash Collateral, Notice to File Objections and Setting Final Hearing (Doc. 42).

[39]Final Order Authorizing Use of Cash Collateral (Doc. 64).

14

or priority of LCPI's secured position in connection with the cash collateral issue.[40]  The final order was a slightly modified version of the interim order.

On January 12, 2010, the Court held the review hearing contemplated by the final cash collateral order.  The parties agreed to a budget for the use of cash collateral through April 30, 2010, with a review hearing set for April 21, 2010.  The Court entered a second agreed cash collateral order containing material terms identical to the previous order.[41]  On April 21, 2010, a third agreed order, identical to the second order except for the budget and professional fee carveout amounts, was submitted to and entered by the Court.  The third order governed the period of April 30, 2010, through June 4, 2010.[42]  On May 26, 2010, after another uncontested review hearing, the Court entered a fourth agreed cash collateral order allowing Latshaw to use cash through July 30, 2010.[43]

Resolution of Latshaw's use of cash collateral was routine and uncontroversial.  However, LCPI incurred fees of $81,420.50 ($64,370.50 to Weil and $17,050.00 to Conner

---

[40]Latshaw later contested the validity and amount of LCPI's claim, but not the validity or priority of its security interest.

[41]Second Order Authorizing Use of Cash Collateral (Doc. 116).

[42]Third Order Authorizing Use of Cash Collateral (Doc. 183).

[43]Fourth Order Authorizing Use of Cash Collateral (Doc. 212).

& Winters)[44] and expenses of at least $5,000.00,[45] in connection with the cash collateral orders.

### 2. Latshaw's Claim against LCPI filed in the Lehman Bankruptcy Case

As previously stated, in September 2009, Latshaw filed a two-page proof of claim against LCPI in the Lehman Bankruptcy Case to preserve its right to seek recourse for LCPI's default under the Prepetition Credit Agreement.  On January 22, 2010, LCPI objected to Latshaw's proof of claim.[46]  LCPI's objection consisted of 13 pages, much of which was boilerplate historical information regarding the loan transaction itself– information that could easily have been copied from previously drafted cash collateral orders.  LCPI's principal complaints were that Latshaw failed to attach sufficient documentation to establish its claim (consisting of three paragraphs), and that Latshaw sought consequential damages from LCPI's breach of the Prepetition Credit Agreement, despite a waiver of such damages (four paragraphs).  The objection also included one paragraph contesting Latshaw's right to recoup its damages for LCPI's default.  According to Weil's time records, four different attorneys

---

[44]See Fee Summaries, LCPI Exhibit 12 at 7, and LCPI Exhibit 16 at 2.

[45]See Weil Expense Detail, Latshaw Exhibit 10, at 27-33, 37, 39, 68.  LCPI did not itemize the expenses incurred with respect to each fee category, nor are the expenses listed in chronological order, so it is difficult to determine which expenses related to the cash collateral matter.  However, expense entries that mention cash collateral in the narrative box total in excess of $5,000.

[46]Debtor's Objection to Proof of Claim Filed by Latshaw Drilling Company, LLC (Claim No. 18346), attached as Exhibit C to Latshaw's Objection to Claim # 20 (Doc. 148).

collectively devoted approximately 56 hours over the course of approximately one month creating this document, charging $36,189.50 for this effort.[47]

On February 24, 2010, in response to LCPI's objection, Latshaw amended its proof of claim in the Lehman Bankruptcy Case.  Latshaw also filed a request that it be allowed to withdraw that amended proof of claim because LCPI had filed a proof of claim concerning the same transaction in Latshaw's bankruptcy case, against which Latshaw was claiming recoupment.  Identical claims and counterclaims were now pending before two courts.

On April 12, 2010, LCPI filed a reply (again 13 pages) opposing Latshaw's request to withdraw its amended proof of claim and requesting the New York bankruptcy court to rule on its objection to Latshaw's claim on the merits.[48]  Six Weil attorneys billed 69 hours of time drafting and revising the reply, resulting in fees totaling $41,588.00.[49]  On April 13, 2010, Latshaw filed a short sur-response, and on April 14, 2010, the New York bankruptcy court granted Latshaw's motion to withdraw its claim in the Lehman Bankruptcy Case, finding that the "the proper forum [for resolving the parties' claims against each other] is in Oklahoma."[50] LCPI's objection to Latshaw's proof of claim was then denied as moot.

---

[47]Weil Fee Detail at 16-17.  Hourly rates for these four lawyers ranged from $550 per hour to $870 per hour.  The charges include .8 hours spent by a paralegal, but do not include expenses, such as electronic research expenses, because Weil's application does not contain sufficient detail to allow the Court to determine the purpose of such expenses.

[48]Doc. 8223 in the Lehman Bankruptcy Case.

[49]See Weil Fee Detail at 20, 22-23.

[50]See Transcript of Hearing Held on April 14, 2010, Doc. 8490 in the Lehman Bankruptcy Case, at 75-77.

### 3.    LCPI's Proof of Claim filed in Latshaw's bankruptcy case

On February 16, 2010, LCPI filed identical claims against each of the Latshaw entities for payment due under the Prepetition Credit Agreement in an amount of not less than $45,847,390.21, comprised of principal, accrued interest, and an estimated $500,000.00 for additional costs, expenses, and attorney fees (the "Disputed Claim").   Five Weil attorneys participated in drafting a six page attachment to the proof of claim forms.  The attachment simply describes the loan transaction, perfection, and the amount allegedly owed, and contains six paragraphs of the usual disclaimers and reservations of rights.   In total, Weil billed $9,694.50 for 17.5 hours spent drafting the proofs of claim.[51]   Conner & Winters attorneys spent an additional 5.5 hours preparing the proofs of claim for filing, resulting in $1,992.00 in additional fees.[52]   In total, LCPI incurred $11,686.50 in fees to draft and file two identical simple proofs of claim.

On February 24, 2010, each of the Latshaw entities filed an objection to LCPI's claims on identical grounds.   Latshaw argued that (1) LCPI's material breach of the Prepetition Credit Agreement excused Latshaw's further performance and (2) LCPI's claim should be reduced by the amount of damages caused by LCPI's breach and the unearned commitment

---

[51]See Weil Fee Detail at 18.

[52]The 12-page document containing detailed fee entries of Conner & Winters' professionals begins on the fifth page of LCPI Exhibit 16, the first five pages being biographies and summaries.  References to pages of "Conner & Winters Fee Detail" shall be to the numbered pages of the 12-page document.

fee paid to LCPI (through recoupment).[53]   These objections created the disputed matter hereinafter referred to as the "Claims Litigation."

Meanwhile, between February 16, 2010, and March 16, 2010, five Weil lawyers billed 93.8 hours for discussing, and collectively composing and revising a "claims litigation strategy memo," resulting in fees of $43,868.50.[54]

On April 23, 2010, the Latshaw entities amended their objections to LCPI's claims, asserting that provisions in the Prepetition Credit Agreement that limit the type of damages recoverable by Latshaw after LCPI's breach were unenforceable due to LCPI's alleged fraud and willful misconduct.  Specifically, Latshaw alleged that LCPI  knew that it was insolvent at the time LCPI made the loan commitment that it failed to fund, but LCPI failed to disclose these material facts to Latshaw, inducing Latshaw to enter into the Prepetition Credit Agreement with LCPI rather than with some other lender.[55]

On May 25, 2010, LCPI filed a consolidated response to Latshaw's amended objections to proofs of claim ("Response to Latshaw's Claim Objection").[56]  Between April 16, 2010, and May 24, 2010, seven Weil attorneys participated in discussing, drafting, and

---

[53]Objection to Lehman Commercial Paper, Inc.'s Proof of Claim (Claim No. 20) (Doc. 148); Objection to Lehman Commercial Paper, Inc.'s Proof of Claim (Claim No. 5) (Doc. 149).

[54]See Weil Fee Detail at 19-21.

[55]Amended Objection to Lehman Commercial Paper, Inc.'s Proof of Claim (Claim No. 20) (Doc. 186) at 10-11; Amended Objection to Lehman Commercial Paper, Inc.'s Proof of Claim (Claim No. 5) (Doc. 187) at 10-11.

[56]Amended Response to Debtors' Amended Objections to Proofs of Claim Filed by Lehman Commercial Paper Inc. (Doc. 208).

reviewing the 34-page Response to Latshaw's Claim Objection, resulting in fees, for 250.8 hours of services, of $126,193.00.[57]   In addition, two newly admitted Weil lawyers assigned to draft the response incurred Westlaw charges of $6,866.00 during this time period.  On May 24 and 25, 2010, one Conner & Winters partner reviewed the response, made minor changes, drafted the certificate of service, and filed the same, resulting in additional fees of $1,147.00.[58] At a minimum, LCPI incurred fees and expenses of $134,206.00 to produce LCPI's Response to Latshaw's Claim Objection.  This total does not include the substantial fees incurred between February 24, 2010 and April 16, 2010, as a result of numerous lawyers conferencing and drafting interoffice memos regarding the objection and litigation strategy, or the $43,868.50 charged for preparation of the "claims litigation strategy memo."

### 4.    *Disclosure Statement and Plan Confirmation*

On April 8, 2010, the Latshaw entities filed a proposed Joint Disclosure Statement and proposed Joint Chapter 11 Plan.[59]  In the plan (and all subsequent amended plans), Latshaw proposed to pay every creditor's allowed claim in full and demonstrated the means to pay such claims. The plan proposed to pay Ableco's undisputed claim and LCPI's claim, as allowed after resolution of the claims objection, with interest and in full within three years,

---

[57]Weil Fee Detail at 23-29.  Billing rates for the Weil attorneys working on this pleading began at $395 an hour for New York associates admitted in 2009 and 2010, and progressed to $550 and $665 an hour for New York associates admitted in 2004, $790 an hour for the Houston litigation partner, $845 per hour for the New York corporate department partner, and $870 per hour for the New York bankruptcy department partner.

[58]Conner & Winters Fee Detail at 4.  The hourly billing rate of the Conner & Winters partner was $370.

[59]Docs. 170, 171.

pursuant to separate credit agreements containing terms substantially similar to the Prepetition Credit Agreement.  Objections to the disclosure statement were due on May 19, 2010, and a hearing on the adequacy of the disclosure statement was set for May 26, 2010.[60]  LCPI did not file an objection to the disclosure statement, yet Weil billed approximately $24,000.00 for contemplating objecting to the disclosure statement.[61]

On May 24, 2010, Latshaw filed a proposed  First Amended Plan to correct technical errors.[62]  As demonstrated by Latshaw's submission of a red-lined version of the plan indicating the technical amendments, the First Amended Plan did not alter the treatment of LCPI's claim.[63]  On May 25, 2010, Latshaw filed a Notice of Submission of Restructured Credit Agreements for the First Amended Joint Chapter 11 Plan of Reorganization, to which two proposed Amended and Restated Credit Agreements ("Restructured Credit Agreements") were attached, one between Latshaw and LCPI, and the other between Latshaw and Ableco.[64] The proposed Restructured Credit Agreements were similar in form, and contained most of the same boilerplate and negotiated provisions as the Prepetition Credit Agreement (which was an LCPI form).  Under the proposal, however, Latshaw's obligations to LCPI and Ableco would be governed by two separate but equal credit agreements, and the collateral would be overseen by Ableco, rather than LCPI, as collateral agent.  The proposed credit agreements

---

[60]See Order and Notice of Hearing, Doc. 175.

[61]See Weil Fee Detail at 93-94.

[62]Doc. 203.

[63]Doc. 204.

[64]Doc. 207.

preserved the provisions for ratably sharing payments and proceeds.  The two obligations were to be secured by the same collateral.  Because Latshaw did not dispute Ableco's claim, its obligation under the Ableco Restructured Credit Agreement was a sum certain.  The amount of Latshaw's debt to LCPI under the LCPI Restructured Credit Agreement was yet to be determined by trial or other resolution of the Disputed Claim.  The plan provided, however, that Latshaw would deposit monthly accrued interest on LCPI's entire Disputed Claim into an escrow account to secure payments due under the agreement as adequate protection pending the resolution of the Disputed Claim.

The hearing on the adequacy of the disclosure statement was held on May 26, 2010. In order to address issues raised by the parties and by the Court, Latshaw amended the plan and disclosure statement.  The amended disclosure statement was approved on June 4, 2010.[65] A confirmation hearing was set for July 22, 2010.

On July 13, 2010, LCPI voted against the plan and filed a 30-page objection to confirmation of the plan (the "Confirmation Objection").[66]  LCPI argued that Latshaw could not cram down the plan over its dissenting vote because the plan impermissibly classified LCPI's claim separately from Ableco's claim without a reasonable basis, treated LCPI's claim differently than Ableco's claim, and did not provide deferred cash payments equal to the present value of its secured claim.  In addition, LCPI claimed that the plan was not feasible, that it violated the "best interests of creditors" test, was not proposed in good faith, and otherwise failed to comply with § 1129(a) because it failed to treat a purported unsecured

---

[65]See Docs. 213, 214, 221, 222, 228.

[66]Doc. 253.

deficiency claim LCPI might have against one of the Latshaw entities, and because the procedures proposed for determining § 506(b) claims were unworkable.  Between May 5, 2010, and July 13, 2010, seven Weil attorneys participated in researching and drafting the Confirmation Objection, billing approximately $117,000.00 for 235 hours of services.[67]  One Conner & Winters attorney reviewed the Confirmation Objection before electronically filing it, billing $185.00.[68]

No other creditor objected to confirmation.

On July 15, 2010, the Court held a pre-confirmation status conference in order to set deadlines for exchanging evidence to be presented at the now-contested confirmation hearing. Witness lists and proposed exhibits were to be submitted to the Court by July 20, 2010.[69]  On July 19, 2010, Latshaw filed an amendment to the plan to revise the § 506(b) application procedure, addressing one of LCPI's concerns.[70]

Between July 15, 2010, and July 20, 2010, the seven lawyers involved in drafting the Confirmation Objection spent 32 hours strategizing between and among themselves and with various LCPI representatives regarding the upcoming contested confirmation hearing, billing another $16,250.00.[71]  These discussions culminated in LCPI filing a pleading, misleadingly

---

[67]See Weil Fee Detail at 94-99.

[68]See Conner & Winters Fee Detail at 5.

[69]Minute, Doc. 259.

[70]Doc. 261.

[71]See Weil Fee Detail at 100-01.

titled "Statement in Support of Objection to Third Amended Joint Plan . . . ,"[72] in which LCPI

*withdrew* all grounds for objection except its contentions that Latshaw gerrymandered the

Ableco claim into a class separate from LCPI's claim in order to generate an accepting

impaired class (Ableco), and that the plan's treatment of LCPI's secured claim unfairly

discriminated against LCPI in relation to Ableco's secured claim.  LCPI further stated that it

would not be presenting any evidence at the confirmation hearing in support of these limited

objections by way of witness testimony or exhibits.[73]

---

[72]Doc. 262.

[73]Although Latshaw, not LCPI, had the burden of proof with respect to establishing compliance with § 1129 (a) and (b), LCPI still was required to have a good faith factual and legal basis for *each ground* for objection asserted in its Confirmation Objection.  If LCPI had actually intended to pursue its objections, it would have had to present some affirmative evidence in support thereof (for instance, LCPI asserted that the 10% interest rate proposed by Latshaw did not account for the risk that Latshaw may subsequently default on the plan, which would have required expert testimony).  When it came time for LCPI to disclose its supporting evidence, it simply withdrew the objections, which suggests that LCPI lacked a factual basis for some or all of its arguments against confirmation.

The principal drafters of the objection were associate attorneys with 0-3 years experience, yet their hourly rates ranged from $395 to $550 per hour.  Contesting the plan's feasibility and good faith, and compliance with the best interests of creditors test, was spurious in light of the overwhelming, known, and undisputed evidence that Latshaw had a healthy capital structure, was operating at a significant profit, and had never– before or after the bankruptcy filing–failed to make any required installment note payment.  Moreover, the plan provided that LCPI would retain its liens, and its allowed secured claim would be fully satisfied in a relatively short period of time.  Weil's senior attorneys must have recognized that these arguments would be overruled, but they authorized preparation and filing the Confirmation Objection anyway, only to withdraw these shallow arguments a week later. LCPI unfairly seeks to impose the expense of this 235-hour academic exercise on Latshaw. Associate training and development is not the type of reasonable expense contemplated under the Prepetition Credit Agreement's fee provision, nor is it a reasonable expense under § 506(b).

To be sure, creditors have the right to vote against and object to confirmation of a
(continued...)

Nevertheless, six Weil lawyers spent 44 hours over the next two days, billing approximately $30,000.00 (not including $8,220.00 for fees incurred by two attorneys for "non-working travel" to and from Tulsa)[74] to prepare for the confirmation hearing.[75]  At the confirmation hearing, held on July 22, 2010, LCPI appeared through three attorneys.  On the morning of the hearing, Latshaw, LCPI, and Ableco negotiated amendments to certain

---

[73](...continued)

reorganization plan, but it strains credulity to believe that LCPI's objection was made in good faith.  Under Latshaw's plan, LCPI was to receive all relief to which it was entitled under the Bankruptcy Code.  The Court is hard-pressed to imagine a plan more favorable to LCPI.  To the extent that LCPI took issue with some terms of the Restructured Credit Agreement, such issues were not the focus of the Confirmation Objection, and were ultimately resolved through a brief round of good faith negotiation on the morning of the confirmation hearing.  The Court viewed the Confirmation Objection as an attempt to gain leverage in the litigation over the amount of LCPI's claim, and not a legitimate or good faith objection to plan confirmation.

Unfortunately, Latshaw and Ableco were compelled to respond to the Confirmation Objection before it was withdrawn (the cost of which was borne by Latshaw).  See Docs. 264, 267.  Their responses demonstrated the stark disconnect between LCPI's legal arguments and the undisputed facts in the Latshaw case.  The Court also spent considerable time trying to make sense of the Confirmation Objection before it was withdrawn.

Finally, the Court notes that because analysis of Latshaw's proposed plan did not require any intimate familiarity with LCPI's own bankruptcy case, assigning the task to Weil's bankruptcy team was not justified.  LCPI's lead local counsel – a seasoned and respected attorney with over 25 years of bankruptcy experience – could have effectively and efficiently analyzed the plan, the Prepetition Credit Agreement and Restructured Credit Agreements, and Latshaw's financial state, to determine whether LCPI had any legitimate objection to confirmation, and if so, could have drafted a defensible objection.  At an hourly rate of $370, LCPI's local counsel could have addressed the disclosure statement and plan for a tiny fraction of what LCPI was billed for the abandoned Confirmation Objection.

[74]See Weil Fee Detail at 91 (22.8 hours in "Non-Working Travel" category).

[75]See Weil Fee Detail at 34 (11 hours by Houston litigation partner in "Claims Litigation" category) and 101-03 (33 hours by New York lawyers in "Plan and Disclosure Statement" category).

financial covenants in both of the Amended and Restated Credit Agreements, which amendments were reduced to a Letter Agreement and presented to the Court.[76]  Although the Letter Agreement did not directly address LCPI's classification or disparate treatment complaints, LCPI nevertheless withdrew its remaining objections.[77]  The plan was confirmed.

Latshaw's counsel drafted and circulated a standard confirmation order to which was attached the Third Amended Joint Plan of Reorganization, the First Amendment to Third Amended Joint Chapter 11 Plan of Reorganization and Statement of No Adverse Impact, and the Letter Agreement (collectively, the "Plan").  After LCPI quibbled about the form of order, the Court held a telephonic hearing, and on August 2, 2010, entered the order confirming plan submitted by Latshaw.[78]

In total, Weil billed $200,879.50 for services designed to frustrate confirmation of a plan that provided that LCPI would retain its liens and would receive, over three years, deferred cash payments totaling the present value of LCPI's secured claim, to the extent such claim was allowed, which is exactly what the Bankruptcy Code requires in order to confirm a plan over the dissenting vote of a secured creditor.[79]  *In addition*, from May 25, 2010 (when the proposed Restructured Credit Agreements were filed) to July 22, 2010 (the confirmation

---

[76]The parties also agreed to other minor changes to the credit agreements that related to the intercreditor relationship between Ableco and LCPI, but these modifications  did not involve or affect Latshaw or its obligations under the agreement.

[77]Transcript of Confirmation Hearing (Doc. 331) at 20-21.

[78]Doc. 282.

[79]See 11 U.S.C. § 1129(b)(2)(A)(i); In re Pikes Peak Water Co., 779 F.2d 1456, 1461 (10th Cir. 1985); In re Investment Co. of the Southwest, 341 B.R. 298 (B.A.P. 10th Cir. 2006).

date), seven Weil lawyers billed another $54,436.00 for reviewing, analyzing, and discussing between and among themselves and with LCPI representatives the proposed Restructured Credit Agreements drafted by Ableco's capable counsel at the Klee, Tuchin, Bogdanoff & Stern firm.[80]  The proposed Restructured Credit Agreements were ultimately approved with the minor amendments reflected in the Letter Agreement.  Less than 3 hours[81] of the time spent during this period appears to be attributable to communicating with counsel for Latshaw and/or Ableco regarding the proposed Restructured Credit Agreements.

LCPI incurred fees of $253,315.50 to oppose a feasible, confirmable 100% plan.

C.     Post-Confirmation Events

1.     Execution of the Post-Confirmation Implementation Documents

Mac Finlayson, one of the Tulsa lawyers representing Latshaw in preparing the post-confirmation implementation documents to close the Restructured Credit Agreement transaction, appeared as a witness at the hearing on LCPI's Application, and the Court admitted into evidence the affidavit of Mr. Finlayson and attachments thereto.[82]   Mr. Finlayson testified that LCPI did not actively participate in negotiating and drafting the Restructured Credit Agreements prior to confirmation (although, as noted above, its lawyers

---

[80]See Weil Fee Detail at 79-81 ("Credit Agreement" category).  Some portion of that amount was billed for drafting a proposed alternative credit agreement and a proposed "voting agreement."  Whether LCPI ever communicated these proposals to Latshaw and/or Ableco for their consideration is not evident from the time records.

[81]See Weil Fee Detail at 79-80 (6/16/10 - 0.1 hours;  7/15/10 - 0.2 hours; 7/16/10 - 1.9 hours;  7/10/10 - 0.2 hours; 7/21/10 - 0.5 hours).

[82]See Tr. 12/13/11 at 134-41, and Finlayson Affidavit, Latshaw Exhibit 13.  LCPI did not submit any evidence to controvert Latshaw's characterization of the post-confirmation events.

did bill in excess of $54,000 for debating the proposed agreements among themselves).  After confirmation, however, LCPI took aggressive steps to impose new terms and conditions on Latshaw beyond those contemplated in the Plan and the approved Restructured Credit Agreements.  For instance, LCPI desired that some unnamed third party execute a guaranty of Latshaw's obligation under its Restructured Credit Agreement, even though the original transaction did not involve a guaranty and neither the Plan nor the Restructured Credit Agreement mentioned a guaranty.[83]

As another example, the Plan provided that Latshaw would deposit funds into an interest-bearing escrow account in an amount equal to amortized monthly payments on LCPI's Disputed Claim as security for payments due to LCPI in the event that its entire Disputed Claim was allowed.  LCPI demanded that Latshaw execute an agreement that the funds, once in escrow, were no longer Latshaw's property, the effect of which would have vested all the escrowed funds in LCPI, even if the Disputed Claim was not allowed in full.[84] The Plan  provided, however, that when the allowed amount of the Disputed Claim was determined, LCPI would be entitled to the escrowed payments only to the extent to which those payments were due on the claim ultimately allowed, and the remainder, if any, would be returned to Latshaw, subject to the *pari passu* liens of LCPI and Ableco.[85]

---

[83]Tr. 12/13/11 at 136.

[84]Tr. 12/13/11 at 137.  <u>See also</u> Exhibit A to Finlayson Affidavit, Latshaw Exhibit 13, at 6-9.

[85]Exhibit A to Finlayson Affidavit at 7 and n.15, *citing* Plan at 48, § IX.

LCPI also insisted on an intercreditor agreement and adequate protection language in the event of a subsequent Latshaw bankruptcy, neither of which had been contemplated by the Plan or Restructured Credit Agreements.

LCPI's unwarranted attempt to renegotiate and amend the terms under which it would be paid under the confirmed Plan delayed the execution of the Restructured Credit Agreements–and consequently the Plan's "Effective Date"–for more than month, and generated fees in the amount of $130,317.00 for 247.5 hours of services, for which LCPI expects reimbursement from Latshaw.[86]  During this period, Weil billed for services of eight lawyers, including two associates with one year or less of experience at $395 per hour, two associates with one year of experience at $455 per hour, two associates with six years of experience at $665 per hour, and two partners at $845 and $870 per hour.[87]  In addition, one Weil paralegal invested 6 hours, billing at $260 per hour.  Considerable and unreasonable duplication of efforts occurred as eight lawyers reviewed, revised, and discussed the loan and collateral documents that had been drafted by, and were acceptable to, Ableco's lawyers, and which substantially mirrored the loan documents LCPI drafted and executed in connection with its original transaction with Latshaw.  LCPI's pursuit of leverage and advantages not contemplated by the confirmed Plan was neither successful, nor reasonable.

Because the closing documentation satisfied Ableco's careful and capable counsel, the Court concludes that one experienced corporate attorney and one experienced paralegal, rather

---

[86]LCPI's obstruction of the closing caused Latshaw to incur additional fees to its own attorneys in the amount of $25,000.00 to $30,000.00.  Testimony of M. Finlayson, Tr. 12/13/11 at 138.

[87] See Weil Fee Detail at 81-86.

than four corporate attorneys and four bankruptcy attorneys, could have efficiently closed the transaction on behalf of LCPI.  LCPI did not establish that its own status as a Chapter 11 debtor added any complexity to the closing of the Restructured Credit Agreement, and if it did, any increase in the expense resulting from Lehman Bankruptcy Case is not reasonably charged to Latshaw.

### 2.    Claims Litigation

#### a.    Pre-confirmation

Prior to confirmation of the Plan on July 22, 2010, and prior to the commencement of discovery in the Claims Litigation, Weil lawyers billed 734.7 hours in the Claims Litigation category resulting in fees of $403,124.00.[81]  In light of the fact that the issues underlying the claim dispute were not fully developed until LCPI filed its Response to Latshaw's Claim Objection in late May 2010, this amount is excessive.[82]  This total includes the fees incurred in drafting certain documents already described above (*i.e.*,  LCPI's proof of claim ($11,686.50), the "litigation strategy" memo ($43,868.50), LCPI's objection to Latshaw's proof of claim filed in  LCPI's bankruptcy case ($36,189.50), its reply brief in further support of its objection to Latshaw's proof of claim, which included its opposition to Latshaw's motion to withdraw its claim in the LCPI case ($41,588.00), and its Response to Latshaw's

---

[81]Weil Fee Detail at 16-34.

[82]At a scheduling conference held in early June 2010, the Court imposed expedited discovery deadlines and a trial date, and set the matter for an early settlement conference, in an effort to curb the expense of this litigation.

Claim Objection to LCPI's claim filed in this case ($134,206.00)).[83]  In addition, Weil billed

extensive time in this category to interoffice conferences, emails, and review of other

attorneys' work.  It appears that each level of associate was monitored by several levels of

more senior "team members," who in turn were monitored by a partner; this hierarchy

required six to eight lawyers to be familiar with the progress of the litigation at all times,

resulting in excessive interoffice conferences and duplication in reviewing pleadings filed by

Latshaw, reviewing research conducted by other lawyers, and reviewing and revising

numerous drafts of memos, pleadings, correspondence, etc.  Moreover, while much of the

research and drafting occurred in Weil's New York office, the "litigation partner" assigned

to the Claims Litigation was located in Houston, Texas.  The hours spent and fees generated

in the Claims Litigation category during the pre-confirmation period are not reasonable.

b.    Post-confirmation

After the Plan was confirmed, discovery commenced in the Claims Litigation.

Discovery tasks were assigned to Weil associates located in Dallas, Texas, who had not

previously been involved in the Latshaw bankruptcy case.  Two of the more senior Dallas

associates conducted the bulk of the discovery and trial preparation.  Weil also retained and

trained contract attorneys to review documents for production in discovery.[84]  In addition,

Weil assigned several newly admitted associates to research and draft interoffice memos

---

[83]Because Conner & Winters did not segregate its billing statements into categories, the Court cannot determine the amount of fees Conner & Winters incurred in connection with the Claims Litigation.  Therefore, the $403,124.00 figure does not include any pre-confirmation fees, if any, billed by Conner & Winters in the Claims Litigation category.

[84]See, e.g., Weil Fee Detail at 38.

concerning certain discrete legal issues, and each of them billed time familiarizing themselves with the Latshaw matter in order to address one isolated issue.  In one instance, an associate admitted in 2009, billing $430.00 per hour, spent 55.1 hours on what appears to be a single evidentiary issue–the admissibility of newspaper articles– resulting in fees of $23,693.00.[85] Two other more senior lawyers spent another 6.5 hours supervising this associate's assignment, adding another $4,875.00, for a total of $28,568.00 billed on this one evidentiary issue.  Moreover, LCPI did not explain the significance of newspaper articles as evidence in this case, or otherwise justify the amount of time billed on this particular task.

While eight Dallas litigators conducted discovery and otherwise prepared for trial in the Claims Litigation, the litigation partner in Houston, three or four bankruptcy attorneys in New York, and lawyers at Conner & Winters in Tulsa, were all kept advised of, and reviewed and commented on, the progress of the proceeding, compounding the fees several-fold.  For instance, on July 30, 2010, Latshaw filed a motion seeking to admit into evidence certain conclusions contained in the report drafted by the court-appointed examiner in the Lehman Bankruptcy Case.[86]  Seven Weil lawyers and one paralegal, and two Conner & Winters lawyers, spent 135.4 hours to oppose the motion, billing $80,863.50.  This effort produced a

---

[85]The twenty-one time entries for this task, beginning on January 24, 2011, and ending on March 31, 2011, all include some variation of the following sentence: "Research and analyze case law pertaining to double hearsay re: newspaper articles related to [L]atshaw." See Weil Fee Detail at 52-65.

[86]Motion in Limine Pursuant to Federal Rules of Evidence 103 and 702 to Admit Certain Conclusions of Examiner's Report in Lehman Bankruptcy Case ("Motion in Limine") (Doc. 280).

14-page brief and a 6-page letter brief.[87]  On September 9, 2010, the Court issued a bench

ruling overruling LCPI's objection and granting Latshaw's motion.[88]

Thereafter, discovery ensued, with only minor skirmishes that were generally resolved

by stipulation following brief non-evidentiary hearings.  The Court does recognize that

LCPI's ability to access its own documents for production to Latshaw was problematic, as the

documents were no longer kept in the ordinary course of business because LCPI had

transferred assets (and associated documents and computer files) to Barclays Capital and had

transferred documents and files to various document repositories.  LCPI's recordkeeping was

disrupted as a consequence of its own Chapter 11 filing, a condition that did not exist when

Latshaw entered into the Prepetition Credit Agreement.  It is not reasonable to expect Latshaw

to bear the cost of the additional time and expense involved in locating and retrieving LCPI's

own documents (from Barclays Capital, for instance).

[87]See Doc. 284 (LCPI's Response filed August 13, 2010); Doc. 294 (Minute of August 17, 2010 Hearing on Motion in Limine); Doc. 300 (LCPI's Letter Brief filed August 23, 2010).  Again, it appears that several lawyers were drafting the same pleading simultaneously, with three members of Texas litigation team billing approximately $50,000.00, and four members of the New York bankruptcy team billing about $25,000.00.  See Weil Fee Detail at 29-30, 34-38.  Two Conner & Winters lawyers also contributed to the effort, billing approximately $5,500.00.  See Conner & Winters Fee Detail at 6-8.  These figures do not include fees for "Non-working Travel" ($2,873.00) (see Weil Fee Detail at 91-92), travel expense ($1,717.44 from New York) (see Detailed Expense Summary (hereinafter "Weil Expense Detail"), LCPI Exhibit 13, at 27-28), or computerized legal research (unable to determine amount from records provided).

[88]Minute, Doc. 325; Transcript of September 9, 2010 Bench Ruling, Doc. 374, at 14-27; Text-Only Order, Doc. 339.

The Claims Litigation was originally scheduled to be tried on October 18, 2010.[89]

Because LCPI's document retrieval process proved tedious and protracted, the parties jointly

requested a continuance to February 9, 2011, which was granted.[90]  In late January 2011,

Weil's Houston litigation partner, who was designated as LCPI's lead litigation counsel

(though the Dallas litigators performed most of the trial preparation), developed a scheduling

conflict, and upon motion, the Court granted a further continuance to April 5, 2011.[91]  When

it appeared that the conflict would extend beyond April 5, 2011, LCPI requested another

lengthy continuance.[92]  Because Latshaw's trial counsel had relied upon the April 5th date in

scheduling other matters, continuing the trial further would have resulted in a postponement

for several months, prejudicing Latshaw's ability to obtain financing and take advantage of

business opportunities.  Therefore, the Court denied the request for continuance, noting that

multiple lawyers had appeared on behalf of LCPI who could try the case.  Although six

litigation lawyers and at least two experienced bankruptcy lawyers from Weil and two

experienced bankruptcy litigators from Conner & Winters had worked extensively on the

Claims Litigation for over a year, LCPI chose to substitute as lead counsel a Weil lawyer who

had *no prior familiarity with the case*.  Between March 14, 2011, and April 18, 2011,

---

[89]Scheduling Order, Doc. 226.

[90]Docs. 361, 364, 416.

[91]Doc. 421, 422.

[92]Doc. 441.  It took *five* lawyers to generate LCPI's motion for continuance and affidavit, resulting in fees of $6,204.00.  See Weil Fee Detail at 57-58.

34

substitute lead counsel incurred fees of $83,610.00.[93]   While it is LCPI's prerogative to unreasonably incur additional fees by adding yet another lawyer to its legal team, Latshaw is not responsible, under § 506(b) or under the credit agreement, for unreasonably incurred fees and expenses.

On March 3, 2011, LCPI filed a Motion in Limine seeking to exclude, on the grounds of judicial estoppel, certain evidence that Latshaw intended to present to establish the diminution in value of certain assets, namely rig components.[94]   Seven Weil lawyers billed $37,943.50 for working 71.6 hours on the motion.[95]   Conner & Winters billed $1,073.00 to review and file the motion.[96]   Latshaw filed a 10-page response to the motion on March 16, 2011.[97]   Six lawyers for LCPI read the response, billing from 0.2 hours to 1.0 hour each, resulting in $2,511.00 in fees for just reading a single pleading.[98]   This example starkly illustrates how over-staffing the Claims Litigation multiplied LCPI's fees to an unreasonable degree.   Thereafter, four Weil lawyers participated in drafting a reply brief, resulting in another $16,410.00 in fees.[99]

---

[93]See Weil Fee Detail at 59-67.  Substitute lead counsel's billing rate was $900 per hour.

[94]Motion in Limine, Doc. 437.

[95]Weil Fee Detail at 55-57.

[96]Conner & Winters Fee Detail at 10.

[97]Doc. 457.

[98]Weil Fee Detail at 60-61; Conner & Winters Fee Detail at 11.

[99]Reply Brief, Doc. 460; Weil Fee Detail at 60-64.  Local counsel also billed $407.00
(continued...)

On March 29, 2011, the parties appeared in Tulsa for a settlement conference before United States District Judge Claire V. Eagan.  On March 30, 2011, this Court held the final pretrial conference, at which a final Pretrial Order was entered.[100]  Trial was scheduled to commence on April 5, 2011.

On April 1, 2011, the parties partially settled the Disputed Claim.  The settlement, approved by this Court on May 27, 2011, and by the New York Bankruptcy Court on June 16, 2011, provided that LCPI held a secured claim (principal and interest), as of March 31, 2011, in the amount of $38,879,732.91.[101] Latshaw was afforded a one-year "interest holiday," suspending the accrual of interest on LCPI's claim from March 1, 2011 to February 28, 2012.[102]  LCPI's § 506(b) claim was reserved for determination by this Court.[103]

---

[99](...continued)
to review the reply brief, add a certificate of mailing, and electronically file it.  Conner & Winters Fee Detail at 11.

[100]Pretrial Order, Latshaw Exhibit 4.

[101]Latshaw's Motion to Approve Compromise and Settlement of Controversy and Notice of Opportunity for Hearing (Doc. 474), filed on May 4, 2011; Order Granting Motion to Approve Compromise and Settlement of Controversy with Lehman Commercial Paper Inc. (Doc. 478), filed on May 27, 2011; Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(b) Approving Settlement and Compromise Among Lehman Commercial Paper Inc., Latshaw Drilling Company, LLC and Latshaw Drilling and Exploration Company, Inc., Doc 17761 in the Lehman Bankruptcy Case.

[102]Settlement Agreement, attached as Exhibit A to Latshaw's Motion to Approve Compromise and Settlement of Controversy and Notice of Opportunity for Hearing.

[103]Id. at 6, ¶ 3.

LCPI incurred fees of approximately $37,000.00 attending to the settlement documentation (which was drafted primarily by Latshaw's counsel) and drafting a Rule 9019 motion to obtain the approval of the settlement in the Lehman Bankruptcy Case.[104]

### 3.    Fees incurred in filing Fee Applications

Immediately after Latshaw's Plan was confirmed, LCPI filed its first application for allowance of an expense claim under § 506(b) of the Bankruptcy Code (the "First § 506(b) Application"), requesting that $1,401,982,33 in fees, costs, expenses and interest be added to its Disputed Claim.[105]   At that time, LCPI's § 506(b) claim consisted of LCPI's out-of-pocket expenses of $12,803.56, Weil's fees and expenses of $1,210,256.62, Conner & Winters' fees and expenses of $43,722.83, and one month of accrued postpetition interest of $135,199.32.[106] At that point, LCPI estimated that it would incur approximately $500,000.00 in additional fees and expenses to litigate Latshaw's objection to the Disputed Claim.   To prepare the First § 506(b) Application, Weil billed 117.1 hours, resulting in fees of $55,183.50.[107] Conner &

---

[104]See Weil Fee Detail at 66-68.  Conner & Winters billed $222.00 for post-settlement tasks.   See Conner & Winters Fee Detail at 11.

[105]Amended Application for Allowance of Claim of Lehman Commercial Paper Inc. For Interest, Fees, and Expenses Under Section 506(b) of the Bankruptcy Code and Notice of Opportunity for Hearing (Doc. 288) ("First § 506(b) Application"), filed August 17, 2010.

[106]Latshaw deposited the August 2010 interest installment, and subsequent interest installments, into the escrow account established by the Plan, and the escrowed funds have been distributed pursuant to the parties' settlement of the Disputed Claim.   Thus, LCPI's § 506(b) claim no longer includes unpaid postpetition interest.

[107]See Weil Fee Detail at 87-89 ("Fee Application" category) and at 35 ("Claims Litigation" category).

Winters spent 7.3 hours in connection with the First § 506(b) Application, resulting in fees of $2,857.00.[108]

The  First § 506(b) Application (without attachments) consists of only eleven pages of text (twenty-one numbered paragraphs).  Four pages relate the basic procedural history of the case, one page includes a quotation of § 506(b) and another includes a quotation of § 9.5(b) of the Prepetition Credit Agreement (*i.e.*, the fee-shifting provision).  Two pages are devoted to describing, in bullet points, fifteen general categories of services rendered by the Weil firm, and one-half page is devoted to describing four categories of services rendered by Conner & Winters.  One paragraph calculates accrued unpaid interest.  Another paragraph explains that LCPI will be incurring additional fees and expenses.  The final paragraph provides notice and opportunity for hearing.  None of the eleven pages contains any legal analysis.

Attached to the application are four exhibits.  Exhibit A consists of invoices and expense reports that demonstrate LCPI's out-of-pocket expenses.  Exhibit B consists of a one-page summary of Weil's expenses totaled by category; a two-page timekeeper summary chart listing each Weil professional that billed time on the Latshaw matter, the professional's year of bar admission, hourly rate, total hours billed, and total fees billed; and 118 pages of time entries in chronological order.  The time entries are not segregated by task category,  however, rendering it impossible for the Court (or any reviewer) to determine whether time spent and fees charged for any particular task was reasonable.  Exhibit C contains the same types of

---

[108]See Conner & Winters Fee Detail at 6-7.  Conner & Winters apparently included its fee application tasks in its General Case Administration category.

summaries for Conner & Winters, along with copies of Conner & Winters' billing statements through July 31, 2010, and its work-in-process statement through August 12, 2010.  Exhibit D is a copy of an email advising Latshaw of the amount of interest due to LCPI on August 13, 2010.

Eight Weil lawyers and one paralegal were involved in drafting and compiling the unremarkable and uncomplicated First § 506(b) Application.  One attorney, admitted in 2007, devoted 39.6 hours to this task, at $550 per hour.  At the same time, four other newly admitted attorneys billed 49.3, 11.7, 3.5, and 1.0 hours, respectively, at $395 to $455 per hour, for purportedly drafting the same document.  Three supervising attorneys spent 4.3, 4.0 and 1.0 hours directing and reviewing the work of these multiple associates.  The paralegal, who prepared the schedules of fees and expenses, billed only 3.5 hours at $215 per hour.

LCPI did not present any evidence that compiling the information for and drafting a standard § 506(b) application required the skills or attention of eight lawyers.  In fact, in light of the mundane legal issue involved (*i.e.*, § 506(b)), and the fact that Weil segregated its services on the Latshaw matter from services rendered in its own bankruptcy case,[109] making

---

[109]See excerpt from Weil's application for interim approval of fees as counsel to LCPI, as debtor-in-possession, filed in the Lehman Bankruptcy Case, Latshaw Exhibit 11.  In this § 331 interim fee application, Weil explained that where third parties, such as borrowers, were contractually responsible for LCPI's fees and expenses, Weil opened a separate billing account in order to bill the borrower directly, and if the borrower did not promptly pay, such fees and expenses would be added "in summary fashion" to Weil's future interim fee applications in the Lehman Bankruptcy Case.

Since neither Weil nor Conner & Winters billed Latshaw directly, it appears that LCPI paid Weil and Conner & Winters for the services rendered in the Latshaw matter through the interim fee application process in the Lehman Bankruptcy Case.

compilation of the time entries as routine an exercise as creating a client billing statement, the Court concludes that one experienced lawyer could have efficiently drafted the application, and a paralegal could have compiled the supporting documentation, at a fraction of the expense.[110]

After the settlement of the Disputed Claim was approved, LCPI filed its amended and supplemental application for allowance of expenses under § 506(b), requesting reimbursement of a total of $2,799,854.02 ($2,643,452.00 in fees and $156,402.00 in expenses) (the "Second § 506(b) Application").[111]  The Second  § 506(b) Application is a 12-page, slightly-modified version of the First § 506(b) Application, to which is appended an exhibit containing Weil's time entries now organized into task categories;[112] a summary of the number of hours billed, hourly rates, and total dollar amount billed by each lawyer and paraprofessional; and a summary of hours and amount billed in each task category.  The exhibit representing Conner

---

[110]Again, it is not reasonable that Latshaw bear the expense of training new associates. There is no reason why a firm like Weil would not have a standard form of § 506(b) application, or why Weil would not have sought assistance of local counsel (whose hourly rate is lower than the rate charged by Weil's first year associates) to draft an application consistent with this Court's local customs and standards.

[111]Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. for Interest, Fees, and Expenses Under Section 506(b) of the Bankruptcy Code (Doc. 491), filed on July 28, 2011.  Notwithstanding the title, as stated above, LCPI no longer seeks post-petition interest.

[112]Sorting Weil's time entries into task categories satisfied one of Latshaw's objections to the First § 506(b) Application.  See Latshaw's objection to the First § 506(b) Application, filed August 23, 2010 (Doc. 301).  Additionally, LCPI addressed some of the objections asserted by the United States Trustee to the First § 506(b) Application by eliminating a few hours of time billed by certain minimally-involved attorneys and support staff.  See Limited Objection (Doc. 307) filed August 24, 2010.

& Winters' fees does not divide the time entries into task categories, however; these entries are arranged chronologically.

Six Weil lawyers spent 52.9 hours and billed $26,845.50 to draft and compile the Second § 506(b) Application.[113] The two new admittees who billed the most time drafting the First § 506(b) Application billed 30.3 and 20.8 hours, respectively, now at $495 per hour, to revise and supplement the prior application.

Again, Weil assigned too many lawyers to draft the § 506(b) applications, and an unreasonable number of hours were spent by inexperienced lawyers billing at elevated hourly rates.

## III.   CONCLUSIONS OF LAW

Section 506(b) authorizes an oversecured creditor to recover "reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."[114] In order to recover such fees, costs, and charges –

> (1) the claim must be an allowed secured claim; (2) the creditor holding the claim must be oversecured; (3) the entitlement to fees, costs, or charges must be provided for under the agreement or state statute under which the claim arose; and (4) the fees, costs and charges sought must be reasonable in amount.[115]

With respect to the first two requirements quoted above, it is undisputed that LCPI has an allowed secured claim and that LCPI is oversecured. Latshaw's objection focuses on the third

---

[113]See Weil Fee Detail at 90-91.

[114]11 U.S.C. § 506(b).

[115]In re Sun 'N' Fun Waterpark LLC, 408 B.R. 361, 366 (B.A.P. 10th Cir. 2009).

and fourth requirements.  LCPI has the burden of establishing its entitlement to fees and the reasonableness of the fees sought.[116]

Regarding entitlement to fees, LCPI cites ¶ 9.5(b) of the Prepetition Credit Agreement. Latshaw argues that because LCPI would not have incurred fees and expenses but for LCPI's breach of the Prepetition Credit Agreement, all fees sought, "particularly that portion described as Claims Litigation, along with related expenses, must be denied" as outside the scope of ¶ 9.5(b).[117]  Latshaw also submits that LCPI's fees are not reasonable in amount, and to the extent that fees for any services are reimbursable under ¶ 9.5(b), only a reasonable fee for such services should be allowed.

Initially, the Court notes that temporally, § 506(b) only authorizes recovery of reasonable fees and expenses incurred *after* the petition date.[118]  In its § 506(b) Applications, LCPI requests fees and expenses incurred both prepetition and postpetition.  Technically, LCPI's request for prepetition fees and expenses seeks determination and allowance of the fee and expense portion of its prepetition Disputed Claim, an issue not resolved by the parties' settlement.  Fees and expenses incurred prepetition arise solely under the fee-shifting provision set forth in the Prepetition Credit Agreement (¶ 9.5(b)) and applicable state law, and may be recoverable under § 502(b), not § 506(b).  Ultimately, because both § 506(b) and

---

[116]See, e.g., In re 900 Corp., 327 B.R. 585, 595 (Bankr. N.D. Tex. 2005).

[117]Objection to Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. For Interest, Fees, and Expenses Under § 506(b) of the Bankruptcy Code (Doc. 494) at 7, ¶ 15.

[118]See In re Gledhill, 164 F.3d 1338, 1340 (10th Cir. 1999).

¶ 9.5(b), as informed by state law, employ a reasonableness standard, there is no need to belabor the distinction for the purpose of evaluating the amount of fees and expenses that should be allowed.

A.     Scope of ¶ 9.5(b) of the Prepetition Credit Agreement

The relevant portion of ¶ 9.5(b) of the Prepetition Credit Agreement provides–

Borrower agrees . . . to pay or reimburse each Lender and the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including, without limitation, the reasonable fees and disbursements of counsel to each Lender and of counsel to the Agents . . . .[119]

Latshaw argues that LCPI would not have had to incur any of the fees or expenses that it now seeks to impose on Latshaw had LCPI not breached the Prepetition Credit Agreement. As a factual matter, the Court agrees, but that fact does not resolve the issue of whether the fee-shifting provision of the Prepetition Credit Agreement applies nevertheless.  The question is whether LCPI's efforts to defend itself against Latshaw's pursuit of redress for the breach, and LCPI's efforts to establish the validity and amount of its claim in Latshaw's bankruptcy case (which Latshaw contested only because of LCPI's breach) can be characterized as "enforcement or preservation" of LCPI's rights under the Prepetition Credit Agreement. Accordingly, the Court must first determine the scope of the "enforcement or preservation" language.

---

[119]Prepetition Credit Agreement, LCPI Exhibit 1, ¶ 9.5(b).

The Prepetition Credit Agreement is "governed by, and construed and interpreted in accordance with, the law of the State of New York."[120]  New York subscribes to the American Rule, which holds that litigation attorney fees are not recoverable as costs or damages unless specifically provided under statute, agreement, or court rule.[121]  Consequently, fee-shifting provisions in contracts are narrowly construed, and a party is permitted to recover its fees from the other party to the contract only when the language is "unmistakably clear" that the parties intended the provision to apply to the fees at issue.[122]  As the New York Court of Appeals observed in the case of Hooper Associates, Ltd. v. AGS Computers, Inc.,

> [t]he words in a contract are to be construed to achieve the apparent purpose of the parties.  Although the words might seem to admit a larger sense, yet [sic] they should be restrained to the particular occasion and to the object which the parties had in view.  This is particularly true with indemnity contracts.  When a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed.  The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.  Inasmuch as a promise by one party to a contract to indemnify the other for attorney's fees incurred in litigation between them is contrary to the well-understood rule that parties are responsible for their own attorney's fees, the courts should not infer a party's intention to waive the benefit of the rule unless the intention to do so is *unmistakably clear*.[123]

---

[120]Id., ¶  9.11.

[121]See, e.g., Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 955 F. Supp. 203, 217 (S.D.N.Y. 1997) (citations omitted).

[122]Oscar Gruss, 337 F.3d at 199, *quoting* Hooper Assoc. Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989).

[123]Bonnie & Co., 955 F. Supp at 218, *quoting* Hooper Assoc. Ltd. v. AGS Computers,
(continued...)

Although the issue in the cited cases was whether an indemnification clause could be read to include fees arising from litigation between the contracting parties rather than litigation between one party to the contract and third parties resulting from the conduct of the other contractual party, the policy – reading fee-shifting clauses narrowly because parties should bear their own litigation expenses – is applicable here.

The Hooper court advises that the interpretation should be "restrained to the particular occasion and to the object which the parties had in view,"[124] which suggests an inquiry into the subjective intent of the parties at the time they entered into the Prepetition Credit Agreement.  But, although the language of ¶ 9.5(b) is broad, it is not ambiguous.  In absence of an ambiguity, the subjective intent of the parties as to the meaning of ¶ 9.5(b) is neither relevant nor admissible (and indeed no evidence of subjective intent has been offered).[125]  It is the Court's duty to determine, as a matter of law, an objective (or reasonable), but narrow, interpretation of what the parties most likely intended ¶ 9.5(b) to mean based on the content of the whole Prepetition Credit Agreement and the transaction effected thereby.[126]

Paragraph 9.5(b) is situated within the context of a multi-faceted section entitled "Payment of Expenses."  Clause (b) of ¶ 9.5 addresses just one of many types of expenses a

---

[123](...continued)
Inc., 74 N.Y.2d 487, 491-92, 549 N.Y.S.2d 365, 367, 548 N.E.2d 903 (1989) (internal citations omitted) (emphasis added).

[124]Id.

[125]See , e.g., Etzion v. Etzion, 84 A.D.3d 1015, 924 N.Y.S.2d 438 N.Y.A.D. 2 Dept. (2011).

[126]Id., 924 N.Y.S.2d at 440-41.

lender or agent may incur that the borrower agrees to reimburse. Clause (a) of ¶ 9.5 requires the borrower to pay expenses, including attorney fees, incurred by the lender or agent in documenting, implementing, syndicating, and administering the credit transaction itself, and clause (c) shifts administrative costs, such as recording fees and taxes, to the borrower. Under clause (d) of ¶ 9.5, the borrower agrees to indemnify and hold the lender harmless from losses and expenses, including attorney fees, incurred in defense of third party lawsuits arising out of the transaction or the borrower's conduct and performance in connection therewith, or the borrower's use of the proceeds or collateral.

Because clauses (a), (c), and (d) specifically encompass reimbursement of attorney fees related to documenting and closing the transaction, perfecting security interests, administering the loan, and defending third party actions, the "enforcement" and "preservation" of rights language of clause (b) should be interpreted to require reimbursement of fees and expenses in instances not already addressed by the other clauses. Fees and expenses incurred by the lender in litigation between the borrower and lender naturally fall within the scope of "enforcement" and "preservation" of rights.

It is "unmistakably clear" to the Court that ¶ 9.5(b) would require a defaulting borrower to pay reasonable fees and expenses incurred by LCPI in enforcing its rights under the Prepetition Credit Agreement, by litigation or otherwise. But Latshaw claims it was not a defaulting borrower, or at least, it was not the first party in default. Latshaw made all scheduled payments required under the agreement until LCPI accelerated the debt, and made

payments consistent with the original terms of the agreement thereafter.  Non-payment of the accelerated debt constituted a default, however.

Latshaw argues that because New York law "implies good faith and fair dealing" in every contract, ¶ 9.5(b) cannot be interpreted to require a non-defaulting borrower such as Latshaw to pay fees LPCI incurred in defending itself from the consequences of its own breach.  The problem with that argument, however, is that Latshaw demanded a reduction in the debt (or offsetting damages) that may or may not have been warranted under the agreement, and LCPI may have been legally justified in refusing to capitulate.  Because the Claims Litigation was settled, the complicated issues concerning the parties' respective rights following LCPI's failure to honor its commitment to fund, and the extent of Latshaw's liability to LCPI and/or LCPI's liability to Latshaw following the alleged mutual breaches, were never resolved on the merits. Although Latshaw presented evidence at the hearing on the § 506(b) Application that established that LCPI chose a shamelessly aggressive, and expensive, strategy to collect the debt and mitigate losses, the Court cannot assume that LCPI lacked good faith with respect to enforcing and preserving its rights under the agreement in the absence of a full airing of the parties' competing claims.

In any event, the Court concludes that the plain language of ¶ 9.5(b), even "narrowly construed," does not limit LCPI's entitlement to reimbursement of its fees and expenses to situations in which it was not in default.  The fee-shifting provision is certainly highly skewed to favor LCPI.   It encompasses actions both offensive (enforcement) and defensive (preservation).  It is not mutual.  It is not even  dependent upon LCPI prevailing in litigation.

And while the provision may not seem fair or equitable in this situation, the Court cannot impose restrictions on LCPI's entitlement to fees that are not set forth in the Prepetition Credit Agreement.

Latshaw also submits that it is not reasonable to assess fees incurred in connection with the Claims Litigation against Latshaw because LCPI's admitted breach initiated the dispute. Again, the Court concludes that LCPI's assertion and prosecution of the Disputed Claim, and its response to Latshaw's affirmative defenses, were actions intended to enforce provisions of the agreement[127] and to preserve LCPI's rights under the agreement,[128] and thus were within the scope of ¶ 9.5(b).  For example, the Prepetition Credit Agreement provided that Latshaw waived "to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding . . . any special, exemplary, punitive or consequential damages."[129]  Fees incurred by LCPI in asserting this waiver provision as a defense to Latshaw's recoupment of damages claim constitute fees incurred to "enforce" the waiver provision and to "preserve" LCPI's right to full repayment under the agreement. Likewise, fees incurred defending against Latshaw's argument that the Prepetition Credit

---

[127]According to Black's Law Dictionary, "enforce" means "1. To give force or effect to (a law, etc.); to compel obedience to. 2. Loosely, to compel a person to pay damages for not complying with (a contract)."  Black's Law Dictionary (9th ed. 2009).

[128]The Oxford English Dictionary's entry for the verb "preserve" includes the following meanings:  "To protect or save from . . . (injury, sickness, or any undesirable eventuality);" "[t]o retain (a possession, property, etc.); to continue to possess, keep hold of;" "[t]o maintain (a condition or state of affairs); to keep up." http://www.oed.com/view/Entry/150728; accessed October 9, 2012.

[129]Prepetition Credit Agreement, ¶ 9.13(e).

48

Agreement should be rescinded for fraud perpetrated by LCPI, or because of LCPI's material breach, were also expended to "preserve" LCPI's rights under the agreement.

With limited exceptions that are detailed below, the fees and expenses sought by LCPI fall within the scope of "enforcement" or "preservation" of LCPI's rights under the terms of the Prepetition Credit Agreement.  Accordingly, LCPI's "entitlement to fees, costs, or charges" is "provided for" under the agreement, satisfying the third prong of § 506(b).

     B.    Reasonableness Analysis

The Prepetition Credit Agreement permits LCPI to demand payment or reimbursement of fees and expenses only to the extent that they are reasonable.  The fourth prong of ¶ 506(b) also permits only reasonable fees and expenses to be added to an oversecured claim.  This limiting principle mitigates some of the inequity inherent in the breadth of the agreement's unilateral fee-shifting provision.

Black's Law Dictionary defines "reasonable" as "fair, proper, or moderate under the circumstances."[130]  LCPI may be reimbursed only to the extent that fees and expenses were reasonably incurred (*i.e.*, for a proper purpose and with appropriate restraint) and are reasonable in amount under the circumstances.

Bankruptcy courts have broad discretion to determine whether certain charges to the debtor are reasonable under § 506(b).[131] Section 506(b) does not provide an oversecured

---

[130]Black's Law Dictionary (9th ed. 2009).

[131]See, e.g., In re Hudson Shipbuilders, Inc.,794 F.2d 1051, 1058 (5th Cir. 1986);  In re Brunswick Apts. of Trumbull County, Ltd., 215 B.R. 520 (B.A.P. 6th Cir. 1998); Chase Manhattan Bank, N.A. v. Wonder Corp. of America (In re Wonder Corp. of America), 82

(continued...)

creditor with a "blank check" to act without regard to the reasonableness of strategies or positions taken, of time spent, or of the number of lawyers engaged.[132]  "[A] rule of reason must be observed, in order to avoid such clauses becoming a tool for wasteful diversion of an estate at the hands of secured creditors who, knowing that the estate must foot the bills, fail to exercise restraint."[133]

A trilogy of opinions arising out of the bankruptcy of Wonder Corporation of America[134] persuasively addresses the role of the bankruptcy court in policing the urge of an oversecured creditor to release the full force and fury of its advocates against a debtor's efforts to reorganize.  Although a bankruptcy court must recognize the lender/creditor's contractual right to charge fees and expenses relating to the loan to the borrower/debtor's account, the bankruptcy court has the authority under § 506(b) to scrutinize a lender/creditor's "enforcement and preservation" strategy in the context of the debtor's legitimate right to take

---

[131](...continued)
B.R. 186, 192 (D. Conn. 1988).

[132]In re Scarlet Hotels, LLC, 392 B.R. 698, 702 (BAP 6th Cir. 2008), *quoting* In re Irick, 216 B.R. 433 (Bankr. E.D. Cal. 1997); In re 900 Corp., 327 B.R. 585, 593 (Bankr. N.D. Tex. 2005), *quoting* In re Center, 282 B.R. 561, 567 (Bankr. D. N.H. 2002); In re Cummins Utility, L.P., 279 B.R. 195, 204 (Bankr. N.D. Tex. 2002) ("Section 506(b) is not intended as a carte blanche for secured creditors to dun the estate.").

[133]Wonder, 82 B.R. at 189 (D. Conn. 1988), *quoting* In re Continental Vending Machine Corp., 543 F.2d 986 (2d Cir. 1976).

[134]See, e.g., In re Wonder Corp. of America, 72 B.R. 580 (Bankr. D. Conn. 1987) ("Wonder I"), *aff'd sub nom* Chase Manhattan Bank, N.A. v. Wonder Corp. of America (In re Wonder Corp. of America), 82 B.R. 186 (D. Conn. 1988) ("Wonder II"); In re Wonder Corp. of America, 96 B.R. 423 (Bankr. D. Conn. 1989) ("Wonder III").

advantage of the provisions of the Bankruptcy Code.[135]  In the <u>Wonder</u> cases, the courts evaluated the oversecured creditors' fee requests by assessing various factors in order to shed light on whether the creditor acted fairly, prudently, and efficiently, and whether the fees incurred were reasonable in amount.  These courts considered, generally, whether (1) the legal services and expenses were authorized by the loan agreement; (2) the services were necessary to promote the client's interest; (3) the charges were permitted under applicable law, including the Bankruptcy Code; (4) the services were compatible with bankruptcy policy; (5) the time spent was appropriate in light of the complexity of the task; (6) the hourly rates were appropriate under applicable standards; (7) tasks were assigned to attorneys that were able to render the services efficiently and competently;[136] (8) billing judgment was exercised to adjust the fee to eliminate unnecessary or duplicative services or expenses; and (9) the bankruptcy court's observation of the nature of the case and the manner of its administration reflects that the fees sought should be further adjusted.[137]

With these principles in mind, the Court makes the following general observations.

### 1.    *The bankruptcy case was not complex*

The Latshaw Chapter 11 case was not a complex case.  LCPI filed only a handful of pleadings, which were described in the above findings of fact.  LCPI should have reasonably believed that it was, at all times, significantly oversecured.  Because Latshaw was solvent and

---

[135]See <u>Wonder I</u>, 72 B.R. at 586-94.

[136]<u>See also</u> <u>Praseuth v. Rubbermaid, Inc.</u>, 406 F.3d 1245, 1258 (10th Cir. 2005) ("time for tasks that were unnecessary, irrelevant and duplicative" should be excluded).

[137]<u>See</u> <u>Wonder I</u>, 72 B.R. at 588–89; <u>Wonder II</u>, 82 B.R. at 191.

profitable, LCPI should have reasonably believed that its claim, once adjudicated, would be paid in full.  The only legitimately disputed issue in the case was the amount of LCPI's claim.

2.     *The number of lawyers assigned to work on this case resulted in substantial duplication of efforts, and no billing judgment was applied.*

LCPI seeks fees for services provided by twenty-eight Weil lawyers and para-professionals (based in three different cities–New York, Houston, and Dallas) and four Conner & Winters lawyers and para-professionals (based in Tulsa).  This proliferation of lawyers resulted in a substantial duplication of efforts, as multiple lawyers billed for reading, reviewing, and revising the same pleadings and documents, sometimes multiple times.  Weil's time records reflect that interoffice conferences (in person, or by phone or email) between and among the professionals billing in this case represent a sizable portion of the total hours billed.  There is no evidence that Weil exercised billing judgment to eliminate or minimize the expense of these duplicated efforts.[138]  "Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended.  Hours that an attorney would not properly bill to his or her client cannot reasonably be billed to the adverse party, making

---

[138]See Praseuth, 406 F.3d at 1258 (hours spent "bringing attorneys up to date about the case as attorneys began work on the file for the first time," hours spent "to discuss and update," and "to discuss status" contributed to the excessiveness of the fee sought).

certain time presumptively unreasonable."[139]   Time *actually* expended in completing a particular task is not necessarily time *reasonably* expended.[140]

A simple example shows how LCPI's fees were magnified by the combination of overstaffing and failure to exercise billing judgment.  On several occasions, four or five Weil lawyers prepared for, participated in, and billed for, the same telephonic hearing.  At the telephonic hearing held in connection with a non-evidentiary discovery issue,[141] five Weil lawyers and one Conner & Winters lawyer billed a total of $2,965.00 for the 45 minute call,

---

[139]Case v. Unified School Dist. No. 233, 157 F.3d 1243, 1250 (10th Cir. 1998), *citing* Ramos v. Lamm, 713 F.2d 546, 553-54 (10th Cir. 1983).  See also Hensley v. Eckerhart, 461 U.S. 424, 434 (1983) (counsel seeking fees from opposing party should make a "good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obliged to exclude such hours from his fee submission.").

LCPI argues that Weil did in fact bill its client, the bankrupt LCPI estate, the exact amount requested herein.  The Court observes that, unfortunately, fees charged to the estate in large chapter 11 cases do not get the scrutiny that a solvent client would give to a legal bill presented for such services.  The fact that Weil would and did bill the LCPI bankruptcy estate for duplicative and excessive services does not persuade the Court that such fees are reasonable.  Latshaw's expert witness (who, as general counsel of a financial institution, routinely scrutinized legal fees billed by that institution's outside counsel), blamed excessive rates, excessive annual increases in rates, overstaffing, and unnecessary duplication of efforts for what, in his opinion, were excessive fees and expenses in this case.  Testimony of N. Tomlins, Tr. 12/13/11 at 149-60.

[140]See Ramos, 713 F.2d at 553, *quoting* Copeland v. Marshall, 641 F.2d 880, 891 (10th Cir. 1980).

[141]See Minute of 12/9/10 (Doc. 406) regarding telephonic hearing on Debtors' Renewed Motion to Compel Response to Discovery Requests, or in the Alternative to Preclude LCPI from Offering Evidence on Issues to Which it Has Not Responded and Request to Restore Motion to Calendar for Telephonic Hearing (Doc 398).

a burn rate of about $4,000 per hour.[142]  The total figure does not include fees charged by each lawyer for preparing for the call or passing on what happened to others after the call.  As another example, prior to Latshaw's bankruptcy, four Weil lawyers spent over 26 hours drafting, reviewing, revising, and discussing the final notice of default and acceleration.  That one unremarkable eight-paragraph letter cost LCPI $11,000.00.[143]

Latshaw's legal team, on the other hand, consisted of two experienced Tulsa lawyers who performed the bulk of the bankruptcy case administration, and two New York lawyers who focused primarily on the LCPI Claims Litigation.[144]  Latshaw's team performed all services required to shepherd this Chapter 11 case to a prompt plan confirmation in a competent, efficient, and cost-effective manner, even in the face of LCPI's scattershot opposition.

Prior to the Plan's effective date, Latshaw's lean legal team billed a total of $462,208.50; LCPI's fees were $1,292,801.75 during the same period.[145]  Of those totals, Latshaw incurred fees of $112,268.50 to propose, prepare, confirm, and implement the Plan

---

[142]See Weil Fee Detail at 48-49; Conner & Winters Fee Detail at 9.

[143]See Letter dated September 29, 2009, attached as Exhibit N to Latshaw Affidavit, Latshaw Exhibit 12; Weil Fee Detail at 74-75.

[144]The Tenth Circuit authorizes the court to "look to how many lawyers the other side utilized in similar situations as an indication of the effort required."  Case, 157 F.3d at 1250, *quoting* Ramos, 713 F.2d at 554.

[145]See Comparison of Work by Debtors' Counsel & LCPI Counsel, Latshaw Exhibit 15, at 1.

and Disclosure Statement, and to close the Restructured Credit Agreements,[146] while LCPI

incurred fees of $390,629.00 to oppose the Plan, Disclosure Statement and Restructured

Credit Agreement.[147]

Post-confirmation, Latshaw's fees totaled $510,321.75, while LCPI incurred fees,

primarily in the Claims Litigation category, of $1,237,301.75.[148]

The Court concludes that under the circumstances of this case, LCPI's legal team was

overstaffed, resulting in inefficiency and duplication, the cost of which was not mitigated by

the proper exercise of billing judgment.

---

[146]See Satterlee Final Fee Application (Doc. 336) at 10 ($12,231.50); MorrelSaffaCraige Final Fee Application (Doc. 327) at 5 ($57,882.50 in Plan & Disclosure Statement category and $42,154.50 in Plan Implementation category, much of which might have been avoided had LCPI participated in the confirmation process in a reasonable manner).

[147]See Weil Fee Detail at 8 (Weil billed $200,879.50 in the Plan & Disclosure Statement category and $54,436.00 in the Credit Agreement category pre-confirmation and $129,317.50 in the Credit Agreement category from confirmation to closing of the Restructured Credit Agreement); Conner & Winters Fee Detail at 3 (Conner & Winters billed $5,996.00).

Again, while LCPI's claim was large ( *i.e.*, $45 million), the bankruptcy case involved only a handful of creditors, was not at all complex, and a plan was confirmed approximately eight months after the petition was filed that provided for rapid payment of 100% of LCPI's allowed claim, exactly the treatment promised by Latshaw at the first hearing.

[148]See Comparison of Work by Debtors' Counsel & LCPI Counsel, Latshaw Exhibit 15, at 1.  While the Claims Litigation involved extensive document production, only five depositions were taken, very few pleadings were filed, and discovery disputes were for the most part resolved with little judicial involvement.  The dispute was settled on the eve of trial.

3.      *Underutilization of local counsel*

LCPI underutilized the considerable Chapter 11 bankruptcy expertise offered by the two Conner & Winters partners, Timothy Trump and Andrew Turner, acting as local counsel. Mr. Trump was admitted in 1984, and is certified by the American Board of Certification in consumer and business bankruptcy law.  He billed LCPI $370 per hour.[149] Mr. Turner was admitted in 1981, and is also board certified in business bankruptcy law.  His billing rate was $430 per hour.[150] In contrast, hourly fees charged by Weil associates with zero to six years of experience ranged from $355 to $665.[151]

While Mssrs. Trump and Turner were well qualified to represent LCPI on matters that arise in Chapter 11 cases – cash collateral issues, analysis of the disclosure statement and plan, and drafting routine motions, for example–these matters were assigned instead to multiple Weil associates, some with little or no legal experience.  LCPI failed to explain why those matters were not handled by their capable, competent, and relatively inexpensive local counsel.  Either of these experienced Chapter 11 lawyers could have provided LCPI with excellent representation, while billing a fraction of the cost generated by the multi-layered team approach employed by Weil.

---

[149]Testimony of T. Trump, Tr. 12/13/11 at 46-48.

[150]LCPI Exhibit 16 at 1.

[151]LCPI Exhibit 12 at 2-3.  LCPI did not provide the Court with biographical or educational information regarding any of the Weil professionals; the only information provided from which to glean the experience of the billing lawyer, or the reasonableness of his or her rate, is the year of bar admission.

Conner & Winters' professionals, however, were relegated to reviewing the pleadings drafted by Weil lawyers and filing those pleadings electronically, and reviewing pleadings filed by other parties in the bankruptcy case (adding yet another layer of fees).  Only a few entries in Conner & Winters' time records reflect drafting or performing other legal tasks or dispensing legal advice.  From the time records, it does not appear that Conner & Winters' attorneys had contact with LCPI representatives or with Weil attorneys, except in connection with electronically filing documents drafted by Weil attorneys, and accompanying Weil attorneys to hearings.

LCPI's representative testified that he never discussed with Weil lawyers, or with anyone else, whether Conner & Winters should handle any aspect of the Latshaw bankruptcy case.[152]  It was LCPI's prerogative to engage Weil to perform all of its substantive legal work, regardless of cost.  But to the extent that LCPI believed that it was entitled to shift its own fees to Latshaw, LCPI had a duty to assign tasks to professionals that could render the necessary services efficiently and competently.  It is not fair or reasonable to expect Latshaw to bear, through the fee-shifting mechanism contained in the Prepetition Credit Agreement, excessive fees resulting from excessive time spent by inexperienced lawyers[153] billing at

---

[152]Testimony of H. Liao, Tr. 12/13/11 at 31.

[153]"[T]ime spent reading background material designed to familiarize the attorney with the area of the law would normally be absorbed into a firm's overhead and . . . therefore attempting to charge an adversary with time spent conducting background research is presumptively unreasonable."  Case, 157 F.3d at 1253, citing Ramos, 713 F.2d at 554.  See also Praseuth v. Rubbermaid, Inc., 406 F.3d 1245, 1258 (10th Cir. 2005) ("When counsel is inexperienced, a losing party should not be obligated to pay for that counsel's legal education.").

excessive rates, when the same services could have been provided efficiently and cost-effectively by the two experienced lawyers retained as local counsel.

### 4.      Unreasonable hourly rates

Absent unusual circumstances, when a creditor is entitled to assess fees against the debtor or its estate, reasonable hourly rates are those "in line with those prevailing in [the] community [where the bankruptcy case is pending] for similar services by lawyers of reasonably comparable skill, experience and reputation."[154]  Although the Court may approve higher rates in cases that are "extremely complex or national in scope,"[155]  Latshaw's bankruptcy case was neither.  LCPI did not establish that it was unable to obtain experienced counsel in the Tulsa community to represent it in this bankruptcy case.  On the contrary, LCPI retained Conner & Winters, but did not take advantage of the considerable expertise offered at local rates.

Rates prevailing in this community for similar services by lawyers of reasonably comparable skill, experience, and reputation were demonstrated at trial in several ways.  First, LCPI's own local counsel, Conner & Winters, billed $370 to $430 per hour for partners having in excess of 25 years experience, and billed $165 to $175 per hour for associates and $135 per hour for paralegals.  Second, partners with over 25 years of experience at

---

[154]United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1234 (10th Cir. 2000).  See also Praseuth, 406 F.3d at 1259 ("While a party is free to select counsel from any locality, absent a clear showing that the matter could not have been reasonably handled by counsel from the locality, rates above the prevailing local hourly rates should not be applied.").

[155]In re Cambern, 134 B.R. 565, 568 (Bankr. E.D. Tex. 1991).

MorrelSaffaCraige, P.C., Latshaw's bankruptcy counsel, also based in Tulsa, charged $250 to $300 per hour, and the firm charged $50 per hour for paralegal services.  The Court has approved these rates as reasonable.[156]

Finally, practitioners in the Northern District of Oklahoma conduct an annual local rate survey for the purpose of establishing a range of reasonable rates for lawyers with various levels of experience, which was used by Latshaw's expert witness in opining on the reasonableness of LCPI's fee request.[157]  Deriving his numbers from the Rate Survey, the expert indicated that the highest local rates for lawyers with more than 20 years of experience ranged from $380 to $580 per hour, and that the mid-range rates for that group ranged from $275 to $300 per hour.[158]  The expert also reported that the highest local rate for a lawyer with 10 to 15 years of experience was $350 per hour (mid-range - $250), and the highest local rates for lawyers with zero to 10 years of experience ranged from $225 to $275 (mid-range from $175 to $225).  The highest local rate for paralegal services was $200 per hour (mid-range - $125).

---

[156]See Final Application of Counsel for Debtor in Possession for Compensation and Reimbursement of Expenses filed 9/10/10 (Doc 327); Order Granting Application (Doc. 372).

[157]See Year 2010 Local Rate Survey of Tulsa Law Firms ("Rate Survey"), attached as Exhibit A to Latshaw's Objection to Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. For Interest, Fees, and Expenses Under § 506(b) of the Bankruptcy Code (Doc. 494).

[158]Exhibit A to Report of Expert Testimony, Latshaw Exhibit 14 (expert's application of rate survey figures to hours incurred by Weil lawyers of varying experience).

Latshaw's New York based counsel, Satterlee Stephens Burke & Burke LLP, was engaged by Latshaw prepetition to represent it in the Lehman Bankruptcy Case, and was approved as special counsel in this case in connection with the Claims Litigation. Satterlee charged the estate $535 per hour for partner Christopher Belmonte's services, the same rate it charged its New York clients. Mr. Belmonte was admitted to the bar in 1977. Satterlee also billed $300 per hour for services of an associate with 8 years of experience.[159] Both of these rates fell close to or within the high end of the customary rates charged in Tulsa, and the Court approved Satterlee's rates as reasonable.[160]

Weil's hourly rates were generally two to three times higher than local rates. Hourly rates of the four partners assigned to the case, each of whom had 20 years or more experience, ranged from $790 to $950. Associates with 10 to 15 years experience billed at $695 to $790 per hour, and those with less than 10 years experience charged from $355 to $740 per hour. Weil's paralegals were billed at $195 to $260 per hour. Weil's rates far exceed rates

---

[159]Two other Satterlee lawyers with 20 plus years of experience billed minimal time at $380 per hour.

[160]In addition, Latshaw engaged special counsel located in Houston to continue litigating claims and cross-claims in state court in Texas. Special counsel had 13 years of experience and billed at a Houston rate of $500 per hour. The Court approved special counsel's compensation at Houston rates because the litigation occurred in Texas. See First and Final Application of Special Counsel for Debtor in Possession for Compensation and Reimbursement of Expenses (Thompson & Knight) (Doc. 223); Ramos, 713 F.2d at 555 (fees should comport to customary rates in area where litigation occurs).

customarily charged in this district for creditor representation in bankruptcy cases and for representation in litigation.[161]

LCPI argues that the fees and expenses incurred in connection with this case were already approved as reasonable by the bankruptcy judge in the Lehman Bankruptcy Case, and were paid by LCPI's bankruptcy estate.[162]  In support of that argument, LCPI furnished copies of Weil's fourth, fifth and sixth fee application summary sheets filed in the Lehman Bankruptcy Case.  These fee summaries mention the Latshaw case only in passing and do not break out the number of hours spent or fees incurred on the Latshaw matter, or on any other specific matter.  In any event, the judge in the Lehman Bankruptcy Case was not presented with the issue of whether the fees are reasonably chargeable to Latshaw under the fee-shifting provision of the Prepetition Credit Agreement or under § 506(b).  The interim allowance of Weil's fees under § 331 in the Lehman Bankruptcy Case is not relevant to LCPI's § 506(b) Application in this case.

In addition, LCPI claims it was justified in employing in this case the same counsel it retained to represent it in the Lehman Bankruptcy Case, and in expending extraordinary resources litigating Latshaw's claim objection, because LCPI's bankruptcy estate held $2.8 billion in partially-funded revolving loans similar to the Latshaw loan.  Apparently, LCPI

---

[161]In addition, as pointed out by Latshaw's expert witness, Weil annually increased some professionals' hourly rates by substantial margins – up to 25% – notwithstanding the dismal economic climate in 2009-11.  Testimony of N. Tomlins, Tr. 12/13/11 at 155-56; WGM Attorney Billing Rate Increases, Latshaw Exhibit 15, at 3.

[162]Response to Objections to Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. For Interest, Fees and Expenses Under § 506(b) of the Bankruptcy Code (Doc. 500) at 12, ¶ 30.  Tr. 12/13/11 at 87-98.

feared that the result of the Latshaw Claims Litigation might establish some precedent or

preclusion that could affect its ability to collect those other outstanding assets.[163]  LCPI's

exposure to liability to, or non-payment from, other borrowers whose commitments were

breached by LCPI is not sufficiently related to the enforcement or preservation of LCPI's

rights under Latshaw's Prepetition Credit Agreement.  That exposure arose from LCPI's

financial collapse and its default on other commitments, not by anything Latshaw did.  Thus,

the additional expense of retaining highly compensated New York counsel and vigorously

litigating for that purpose should not be borne by Latshaw.  Latshaw is responsible only for

reasonable fees for reasonable efforts LCPI took to enforce and preserve its rights under

*Latshaw's* credit agreement.

     5.    *Fees are disproportionate to the risk*

In evaluating the reasonableness of fees sought under § 506(b),

> [t]he size of a creditor's equity cushion is an underlying factor in the
> reasonableness determination . . . . [citation omitted].  If the equity cushion is
> large enough that there is no appreciable risk that a creditor will not be paid,
> courts will tend to view large fee claims as being exorbitant because there is no
> purpose in engaging in legal maneuvers.[164]

Although "creditors are entitled to engage counsel and pay for constant, comprehensive, and

aggressive representation, . . . where services are not reasonably necessary or action is taken

---

[163]See LCPI's Opening Statement, Tr. 12/13/11 at 8-9; Testimony of H. Liao, id. at
24-25; Testimony of J. Marcus, id. at 59; Testimony of T. Trump, id. at 50-51.  See also
Second § 506(b) Application, Latshaw Exhibit 17, at 7 ("[A]s a fiduciary on behalf of its own
creditors, LCPI was obligated to make every effort to defeat Latshaw's claim that it was not
required to repay more than $45 million owed to LCPI under the Prepetition Credit
Agreement.")

[164]In re PCH Assoc., 122 B.R. 181, 203 (Bankr. S.D.N.Y. 1990).

because of an attorney's excessive caution or overzealous advocacy, courts have the right and duty, in the exercise of discretion, to disallow fees under § 506(b)."[165]

In this case, the hefty equity cushion that protected LCPI's secured claim from erosion was never seriously called into question.[166]  Fees incurred in connection with cash collateral and the plan and disclosure statement reflect an overzealousness that was not justified by the risk.  Erosion of LCPI's collateral position by Latshaw's use of cash collateral was extremely unlikely because LCPI's interest in Latshaw's prepetition hard assets was sufficient to satisfy the claim.  Latshaw's plan and disclosure statement both proposed to pay LCPI in full, subject to the later determination of the amount of its claim.  LCPI's expenditure of over $80,000 on cash collateral issues, and almost $400,000 to oppose the disclosure statement, plan and Restructured Credit Agreement, was unnecessary for the protection of LCPI's rights, and therefore not reasonable.

---

[165]Wonder I, 72 B.R. at 591.

[166]LCPI claims that it was justified in investing significant time and effort in the cash collateral matter, notwithstanding the existence of an equity cushion that – practically speaking – assured payment of its claim, because "Latshaw was arguing that [LCPI] had zero claim."  Testimony of J. Marcus, Tr. 12/13/11 at 74.  Latshaw, however, did not *ever* assert that LCPI's claim, whatever its amount, was not secured by its assets.  The size of the equity cushion protected LCPI regardless of whether its claim was zero or $45 million.

Likewise, LCPI believed it was reasonable to oppose confirmation of the Plan because "Latshaw was arguing that the allowed amount of the LCPI claim . . . should be zero, and that would have resulted in vastly different treatment [than Ableco]."  Id. at 75.  However, the appropriate battleground for debating the amount of LCPI's claim was the Claims Litigation proceeding; the Plan did not establish the amount of LCPI's claim.

C.    The Unreasonable Portion of Fees and Expenses Will Not Be Allowed as an
      Unsecured Claim under § 502(b)

Before proceeding further, the Court must address an additional argument asserted by

LCPI.  While LCPI's reasonable contractual fees may be allowed as part of its secured claim

under § 506(b), LCPI contends that the amount of fees and expenses the Court deems

unreasonable should be allowed as an unsecured claim, citing the Eleventh Circuit Court of

Appeals opinion in In re Welzel.[167]

Welzel concerned a debt arising from a note that provided upon default, 15% of

balance would be added to the principal as attorney fees.[168]  The note did not place any

reasonableness limitation on such fees.  State law established a procedure a lender must

follow before such an attorney fee provision could be enforced by the lender.[169]  Before

Welzel filed bankruptcy, the lender had provided the statutory notice and opportunity for the

debtor to cure.[170]  After the statutory cure time expired,  the 15% attorney fee had vested, and

became enforceable, as part of the principal debt according to state law.[171]  The Eleventh

Circuit held that the 15% fee was subject to a § 506(b) reasonableness review to determine

----

[167]275 F.3d 1308 (11th Cir. 2001).  See LCPI's Response to Objections at 17-18.
Because Latshaw's estate was solvent, and the Plan provides for full payment of unsecured
claims, LCPI in essence argues that it is entitled to payment in full of reasonable fees as an
allowed secured claim under § 506(b) and payment in full of all unreasonable fees as an
allowed unsecured claim under § 502(b).

[168]Welzel, 275 F.3d at 1311-12.

[169]Id. at 1311.

[170]Id.

[171]Id.

what portion should be added to the secured debt, but the portion deemed unreasonable but otherwise enforceable under state law would be allowed as an unsecured claim under §502.[172]

Welzel is distinguishable from this case because the fee provision in Welzel's note did not provide for "reasonable" fees, but instead, simply a fee equal to 15% of the unpaid balance.  The 15% fee provision was fully enforceable under state law regardless of whether the amount was reasonable in relation to the legal effort required.  As a result, while the secured claim could only include the reasonable portion of the fee under § 506(b), the unreasonable portion of the 15% fee was relegated to unsecured status, and tested for allowance under § 502 of the Bankruptcy Code.  Because the balance of the 15% fee was enforceable under state law, there was no barrier to its allowance under § 502(b).[173]

In Latshaw's case, the Prepetition Credit Agreement provides that LCPI may recover only reasonable fees and expenses from Latshaw, so any claim for fees and expenses found by the Court to be unreasonable is *per se* unenforceable.  Section 502(b)(1) provides that an unsecured claim shall be allowed "except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement . . . for a reason other than

---

[172]Id. at 1318.

[173]Id.  See also Gencarelli v. UPS Capital Business Credit, 501 F.3d 1 (1st Cir. 2007). In Gencarelli, the First Circuit held that a 3% prepayment penalty that arose after a § 363 sale was enforceable under state law, and was thus allowed as a secured claim to the extent it was reasonable; the remainder was allowed as an unsecured claim under § 502.  Again, the agreement under which the penalty arose did not place a reasonableness limitation on the amount of the penalty.  Accordingly, the amount excluded by the § 506(b) analysis was nevertheless recoverable under the contract and applicable state law, and therefore was not excluded from allowance by § 502(b)(1).

because such claim is contingent or unmatured."[174]  Fees and expenses found unreasonable are simply not recoverable by LCPI under any circumstances, and therefore those fees and expenses must be, and will be, disallowed under § 502(b)(1).

      D.    <u>Allowed Fees</u>

          *1.*   *Fees for Prepetition Services*

As stated above, Weil rendered services to LCPI in connection with the Prepetition Credit Agreement for almost a year before Latshaw filed its Chapter 11 petition.[175]  These prepetition services focused on pursuing a strategy to renegotiate the Prepetition Credit Agreement on terms more favorable to LCPI by declaring Latshaw in default, thus mitigating LCPI's exposure to liability to Latshaw for its own breach of the Prepetition Credit Agreement.  LCPI's prepetition fees total approximately $125,000.00.[176]

          a.    Prepetition "Case Administration" Tasks[177]

Weil's prepetition entries for "Case Administration" (spanning January 23, 2009 through October 30, 2009) obviously do not relate to administering Latshaw's bankruptcy case, since Latshaw had not yet filed its Chapter 11 petition.  Thus, the Court has to assume that these fees were incurred in connection with administration of the Lehman Bankruptcy

---

[174]11 U.S.C. § 502(b)(1).

[175]LCPI did not retain Conner & Winters until after Latshaw filed bankruptcy; thus Conner & Winters' fees were all incurred postpetition.

[176]Exhibit B to Report of Expert Testimony, Latshaw Exhibit 14 (separating out prepetition fees).

[177]Weil Fee Detail at 69-77.

Case.  The entries primarily represent correspondence between LCPI attorneys, Ableco attorneys, and LCPI representatives, and also include drafting an "executive summary re Latshaw," apparently for use in the Lehman Bankruptcy Case.

When LCPI filed its Chapter 11 petition, Latshaw was an innocent bystander, a borrower whose credit agreement had been breached by LCPI.  The expense of administering LCPI's bankruptcy must be borne by LCPI's estate, not tacked onto Latshaw's debt.  LCPI's prepetition fees in the "Case Administration" category, totaling $4,600.50 (10.4 hours), are disallowed.

    b.  Prepetition "Credit Agreement" Tasks[178]

LCPI's legal fees for prepetition services related to the "Credit Agreement" (spanning December 12, 2008, through November 10, 2009), total $123,937.50.[179]  Four corporate lawyers, two bankruptcy lawyers that were representing LCPI in the Lehman Bankruptcy Case, and one paralegal spent and billed 276.4 hours in this category.  Time entries reflect that these six lawyers reviewed the Prepetition Credit Agreement over and over; drafted a "debt summary;" constantly met and corresponded with each other, with Ableco lawyers, and with LCPI representatives; drafted and repeatedly revised the various default letters;  reviewed and revised their restructuring proposal term sheet; drafted and revised a forbearance letter; met

---

[178]Id.

[179]Id.

and corresponded with each other concerning the cash sweeps and collateral review; and drafted and revised the final notice of default and acceleration.[180]

Most of the time in this category was billed by three corporate lawyers with little experience – lawyers who had been admitted to the bar from zero to five years and whose billing rates ranged from $355 to $565.  Tasks performed by one of these lawyers were reported to and/or reviewed by two or three other lawyers, all of whom billed their time.  As mentioned above,[181] four lawyers spent over 26 hours drafting, reviewing, revising, and discussing the final notice of default and acceleration, billing in excess of $11,000 for the two-page, eight-paragraph letter.[182]  An experienced corporate lawyer would have drafted such a letter in a few hours.

The Court also concludes that fees incurred by LCPI in conjunction with the intermediate default letters should be partially disallowed because some of the alleged defaults admittedly lacked a factual basis, some were based on a strained reading of the agreement, and some were asserted without knowledge or an understanding of the history of the Latshaw account.  For example, LCPI's lawyers were unaware that LCPI waived the requirement for key man life insurance and were unaware that LCPI's account representative had been satisfied with the format of Latshaw's financial reporting.  LCPI's crusade to force a restructure of the loan under onerous and objectionable terms, and failing that, acceleration

---

[180]Id.

[181]See Section III(B)(2).

[182]Weil Fee Detail at 74-75.

of the note, was neither a fair nor reasonable (or successful) strategy to enforce or preserve LCPI's contract rights. LCPI's threat of foreclosure of Latshaw's operating assets left Latshaw with no choice, in order to save its thriving business and the jobs of 400 employees, but to seek bankruptcy protection. The Court concludes that Latshaw should not reasonably be required to reimburse fees and expenses LCPI paid to its lawyers to attempt to intimidate Latshaw into releasing LCPI from its obligations under the agreement.

Accordingly, the Court finds and concludes that counsel, acting reasonably, fairly, prudently, and efficiently to protect the rights of LCPI under the Prepetition Credit Agreement, could have performed such a service, at New York rates, by assigning the task to one experienced corporate lawyer and an associate. In order to address issues arising in the Lehman Bankruptcy Case, the Court concludes that one experienced bankruptcy lawyer should have sufficed. Proper allocation of resources would have eliminated the redundancy that exaggerated the fee. The Court concludes that $25,000.00 constitutes a reasonable fee for reasonable prepetition efforts to "enforce" the agreement and protect LCPI's rights.[183] The remainder is disallowed.

---

[183]The Tenth Circuit has held that "[t]here is no requirement, either in this court or elsewhere, that . . . courts identify and justify each disallowed hour. Nor is there any requirement that . . . courts announce what hours are permitted for each legal task." Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1203 (10th Cir. 1986). "A general reduction of hours claimed in order to achieve what the court determines to be a reasonable number is not an erroneous method, so long as there is sufficient reason for its use." Id. The Mares panel noted that the United States Supreme Court did not disagree with a reduction by one-third for inexperience, or a reduction in hours of 33 1/3% to 48% for "unnecessary, unreasonable or unproductive time," and in instances where "time spent on a particular activity was 'excessive,' or . . . a less amount of time was 'reasonable.'" Id. (citations omitted).

c.       Prepetition "Fee Application" Tasks[184]

Weil billed LCPI  $1,491.00 for prepetition work on its fee application.  These entries

cannot possibly pertain to preparing the § 506(b) Application submitted in this case, and

therefore such fees are disallowed.

2.     *Fees for Postpetition Services*

a.      Postpetition administration of Lehman Bankruptcy Case

After Latshaw filed its bankruptcy case in November 2009, LCPI continued allocating

fees for services constituting administration of Lehman Bankruptcy Case to its claim against

Latshaw.  At various points, Weil attorneys met with the Official Unsecured Creditors

Committee seated in the Lehman Bankruptcy Case ("Committee") and its counsel to report

on the status of the Latshaw claim.  Weil billed approximately $9,000.00 for these meetings,

and seeks to shift these fees to Latshaw.[185]  But for LCPI's own financial failure, it would not

have incurred these fees, and in any event, reporting the status in the Latshaw dispute to the

Committee was not necessary to enforce or preserve LCPI's rights under the Prepetition

Credit Agreement. Thus, the Court will disallow fees in the following amounts in the

following categories:  Case Administration: $1,786.00; Claims Litigation: $6,989.50; Credit

Agreement: $66.50; Fee Application: $199.50.

---

[184]Weil Fee Detail at 87.

[185]See Latshaw Exhibit 9.

b.      "Case Administration"

LCPI requests reimbursement of $180,873.00 for 327.8 hours Weil billed in the "Case Administration" category.[186]  In addition, LCPI seeks reimbursement of $7,985.00 (22.8 hours) billed by Conner & Winters in this category,[187] for a total of $188,858.00 (350.6 hours).  Fees for prepetition and postpetition administration of the Lehman Bankruptcy Case ($4,600.50 for 10.4 hours[188] and $1,786.00 for 2.6 hours,[189] respectively) have already been disallowed above, leaving $182,471.50 (337.6 hours) to be addressed in this section.

Some of the services itemized in the Case Administration category include engaging local counsel, reviewing pleadings, and developing and drafting a "strategy memo." However, most of the "Case Administration" category reflects billing for discussions, emailing, and conferencing between and among lawyers and paraprofessionals.  Significantly, the time records reflect very limited communications with LCPI representatives, Ableco's counsel, and Latshaw's counsel.  On the other hand, the records reveal hours and hours spent insuring that all the lawyers working on the case were apprised of, and had read, reviewed and commented on, or summarized for someone else, the same ideas, memos, pleadings, and

---

[186]The Court notes that Latshaw's local counsel billed less than $25,000 for general case administration, and its New York counsel billed approximately $7,500 in the case administration category.  See MorrelSaffaCraige, P.C. fee applications (Docs. 157 and 327) at 4 and 5, respectively; Exhibit 2 to Satterlee fee applications (Docs. 180 and 336).

[187]See Second § 506(b) Application, Latshaw Exhibit 17, at 128 of 198 (Summary by Project Category of Services Rendered by Conner & Winters, LLP During the Period November 11, 2009 through June 30, 2011).

[188]See Section III(D)(1)(a), supra.

[189]See Section III(D)(2)(a), supra.

research.  In other words, the cost of "Case Administration" was multiplied by redundancy and duplication of efforts.  LCPI also involved itself in minor matters (and incurred fees) even when it did not make economic sense.  In addition, the cost incurred was often not commensurate to the result desired.

In one example, unreasonable fees were generated in reacting to the filing of the Unopposed Motion for Relief from Automatic Stay of Chesapeake Operating, Inc. ("Chesapeake").[190]  Chesapeake sought stay relief to permit it to pursue a claim against Latshaw for indemnity in connection with the liquidation of a personal injury claim filed against Chesapeake by an injured Latshaw employee.  Latshaw's insurer agreed to defend the claim and satisfy any judgment, subject to Latshaw paying its $10,000 deductible. Chesapeake sought to recover the deductible from Latshaw by setting off Chesapeake's debt to Latshaw under a drilling contract, which was acceptable to Latshaw.  Latshaw then filed a motion seeking to assume the drilling contract in order to continue doing business with Chesapeake under the terms of the contract and to permit Chesapeake to recoup from the proceeds of the contract the potential uninsured portion of the personal injury claim (*i.e.*, the $10,000 deductible).[191]  Certainly, the contract proceeds subject to Chesapeake's recoupment claim may have been LCPI's cash collateral.  However, because LCPI had a substantial equity cushion, the risk of loss to LCPI if Latshaw paid the potential deductible from the Chesapeake proceeds was virtually non-existent.

---

[190]Doc. 133.

[191]Motion to Approve Assumption of Executory Contract (Doc. 136).

LCPI did not object to the motions, but did comment on the proposed orders.  Agreed orders were entered on both motions, granting stay relief and assumption of the contract.[192] The issue of potential recoupment of the $10,000 deductible was reserved to a later date because liability to the injured employee had not yet been established.  Because the recoupment request was not ripe for adjudication, LCPI's concern for its collateral most likely could have been addressed by one lawyer making one or two phone calls to counsel for Latshaw and Chesapeake.  However, Weil's billing records reflect that four Weil attorneys spent 13.4 hours reviewing and discussing these uncontroversial pleadings among themselves, and commenting on the proposed orders, resulting in fees of $7,659.50.[193]

Another example of excessive and unjustified involvement concerns a second-year Weil associate, admitted in 2007, who spent (and billed) at least 78.8 hours consulting with other Weil lawyers and drafting a "strategy memo" for the Latshaw bankruptcy case.  This memo was reviewed and revised by three other Weil lawyers, who collectively spent an additional 20.3 hours.  In total, LCPI incurred fees of $54,352.00 for this case administration "strategy memo."[194]  Latshaw's bankruptcy case was not complex, and from the beginning Latshaw expressed the intent of proposing a plan that paid all allowed claims in full.  LCPI

---

[192]See Order Regarding Motion for Relief from Automatic Stay (Doc. 151); Agreed Order Regarding Motion to Approve Assumption of Executory Contract (Doc. 161).

[193]See Weil Fee Detail at 4-5.  In addition, one Conner & Winters partner billed $185 for .5 hours spent reviewing the motions.  See Conner & Winters Fee Detail at 3.

[194]See Weil Fee Detail at 2-5.  This figure does not include expenses incurred, such as computerized legal research.  Nor does this figure include fees billed for drafting a "litigation strategy" memo – an additional $43,868.50 – which was billed under the category of "Claims Litigation."  See Weil Fee Detail at 19-21.

did not explain how incurring $54,352.00 (plus expenses) to develop a "strategy" for the case was reasonable.[195]

One more example: When LCPI and Latshaw agreed that the stay in the Lehman Bankruptcy Case should be modified to allow the Disputed Claim to heard and determined by this Court, Mr. Belmonte (Latshaw's New York counsel) drafted a proposed stipulated order for entry in the Lehman Bankruptcy Case and circulated it for comment to Mr. Craige (Latshaw's Tulsa counsel) and counsel for Ableco and LCPI.  Mr. Belmonte billed 10.4 hours for drafting, circulating, and revising the stipulation pursuant to the solicited comments, costing the estate $3,496.00.[196]  On behalf of LCPI, however, five Weil lawyers fussed over the order for 17.3 hours, billing $9,098.00, and a Weil paraprofessional spent half an hour preparing it for filing, filing it and sending it for service to appropriate parties, billing $107.50.[197]  The order itself was not complicated and contained eight short stipulated paragraphs regarding the extent of the relief from stay.[198]  Again, prudent case management would have limited the review and revision of the stipulation to one experienced bankruptcy lawyer, with those revisions double-checked for accuracy by perhaps one other lawyer.

---

[195]See, e.g., In re Cummins Utility, L.P., 279 B.R. 195, 204 (Bankr. N.D. Tex. 2002) (case did not require "continuous involvement of high-powered professionals" where oversecured creditor "anticipated or should have anticipated . . . being paid in full.").

[196]See Exhibit 6 of Satterlee's final fee application (Doc. 336) at 10-12.

[197]Time for this task was billed in at least two categories – "Case Administration" and "Claims Litigation."  See Weil Fee Detail at 8 and 31.

[198]See Notice of Presentment of Stipulation and Order . . . , Doc. 9738 in the Lehman Bankruptcy Case.

Internally circulating the proposed stipulation to five lawyers for comments and further revision unnecessarily multiplied the cost of this simple task.

The Court further notes that one Weil attorney, admitted to the bar in 2009, spent the majority of his billed time in the Case Administration category simply reviewing pleadings as they were filed, reviewing other lawyers' emails and work product, attending "strategy" meetings and conferences among the more senior lawyers, and preparing for and attending hearings at which his attendance was unnecessary.  This attorney billed 71.0 hours in the "Case Administration" category at $395 to $495 per hour, resulting in fees of approximately $30,000.00.[199]  This constitutes associate training and development and is not reasonably chargeable to LCPI or Latshaw.   In addition, this attorney also performed services appropriately assigned to a paraprofessional, such as reviewing the docket, calendaring, sorting emails and correspondence, creating summaries of documents drafted by other Weil lawyers, and the like.

Accordingly, evidence of pervasive duplication of efforts caused by overstaffing and charges for unnecessary tasks requires a reduction in the amount of fees allowed for Case Administration.  The Court concludes that LCPI's case administration fees should not exceed Latshaw's case administration fees,[200] and therefore will allow $32,500.00 as a reasonable fee. The remainder should be disallowed as unreasonable.

---

[199]Weil Fee Detail at 5-12.

[200]See n.186, supra.

c.     "Cash Collateral"

LCPI incurred fees of at least $81,420.50 ($64,370.50 to Weil for 99.7 hours of services and $17,050.00 to Conner & Winters for 46.6 hours of services) in connection with its effort to protect its collateral during Latshaw's use thereof during the course of the bankruptcy case.[201]  Although LCPI's counsel represented that the cash collateral orders were "highly negotiated" to insure that LCPI and Ableco would be adequately protected, the fact is that the lenders were at all times grossly oversecured.[202]  In addition, Latshaw's pre and postpetition operations generated  revenue sufficient to pay all current expenses and obligations, including interest to LCPI on the full amount of the indebtedness claimed by LCPI.  It was evident to this Court and should have been evident to LCPI that LCPI was never at risk that its collateral would be diminished.[203]

Moreover, LCPI did not establish that the cash collateral matter was complex or difficult, or that Latshaw was not cooperative.  When asked why local counsel could not have handled these consensual cash collateral matters, LCPI's witness contended that Weil's

---

[201]This figure does not include fees charged for "Non-working Travel" time or for travel expenses.

[202]See Testimony of J. Marcus, Tr. 12/13/11 at 74 ("we believe that LCPI was oversecured").

[203]On various occasions, the Court questioned whether LCPI was even entitled to adequate protection.  Although LCPI was in possession of the recent Hadco appraisal, which confirmed that the collateral had a value of  between $100 million (liquidation value) and $191 million (going-concern value), LCPI would not stipulate that its claim was vastly oversecured.  Latshaw agreed to LCPI's demands for adequate protection in order to avoid the cost of a contested valuation hearing.  Conveniently, LCPI now concedes that it is and was oversecured for the purpose of seeking its fees and expenses under § 506(b).

substantial participation was necessary because the cash collateral matter was intimately related to the allowance of LCPI's claim.[204]  The Court disagrees.  Latshaw did not contest the validity of LCPI's security interest in the cash collateral, nor did Latshaw contest the validity or amount of LCPI's claim for purposes of adequate protection.

Again, duplication of efforts increased the cost of representation.  In the initial week of Latshaw's bankruptcy, three Weil lawyers spent over 40 hours (billing almost $30,000.00) developing  a cash collateral order.  Although much of the work thereafter was performed by the Weil lawyer that appeared at the cash collateral hearings, three Weil partners (billing $790 to $870 per hour) reviewed that lawyer's work.  One Conner & Winters lawyer billed for services in the cash collateral category, which consisted, for the most part, of reviewing drafts prepared by others and advising as to local custom and practice.  As stated above, this effort resulted in an initial short term cash collateral order, and thereafter, another interim order that was essentially renewed on a periodic basis until confirmation.  The Court found LPCI's position regarding Latshaw's use of cash and protections it demanded to be over-reaching and potentially prejudicial to Latshaw's other creditors.  LCPI's aggressive stance was not warranted by the facts, and thus the expenditure of substantial fees in pursuing adequate protection was not reasonable or necessary to protect its claim.

One stark example of redundant services is the 9.2 hours spent by LCPI's "litigation partner" in Houston reviewing the cash collateral orders drafted by LCPI's team of

---

[204]Testimony of J. Marcus, Tr. 12/13/11 at 73 ("the cash collateral issue involved a lot of issues related to the allowance of the claim, whether or not we had a secured claim, what the effect of the alleged breach [had] on our ability to recover the claim").

bankruptcy attorneys situated in New York, for which Weil billed $7,102.50. One newly admitted attorney billed $790.00 for 2 hours spent simply reviewing drafts of cash collateral orders. Neither of these fees were reasonable or necessary to protect LCPI's collateral.

The Court concludes that it was not reasonable for LCPI to invest such extensive efforts, and incur in excess of $80,000 in fees, for protection LCPI clearly did not need, but which Latshaw willingly provided in any event. The Court concludes that the cash collateral issue could have been competently and efficiently handled by local counsel if provided with the appropriate background information from LCPI's representatives or its New York bankruptcy attorneys. Thus, reimbursement at rates in excess of local prevailing rates is not appropriate. Further, had local counsel been assigned the laboring oar, travel expenses would have been avoided.

By eliminating unnecessary duplication of efforts and reducing the hourly rate to a high local rate of $370 per hour, the Court concludes that a reasonable fee for services necessary for protection of LCPI's interest in cash collateral should not exceed $20,000.00. Thus, $20,000.00 is allowed in this category, and the remainder requested is disallowed.

d.    "Plan and Disclosure Statement"

LCPI seeks reimbursement of fees in connection with Latshaw's plan and disclosure statement for services rendered by Weil in the amount of $200,879.50 (386.3 hours) and for services rendered by Conner & Winters in the amount of $5,996.00 (16.4 hours), for a total of $206,875.50 (402.7 hours).[205] As found above, LCPI incurred fees of approximately

---

[205]This figure does not include fees charged for "Non-working Travel" time, for travel
(continued...)

$24,000.00 to produce an objection to disclosure statement that was never even filed, and $117,000.00 for 235 hours of services relating to drafting an objection to confirmation of the plan.  After the Court ordered LCPI to provide Latshaw a witness list and documentary evidence it intended to present at the confirmation hearing, LCPI's lawyers spent another 32 hours trying to determine whether to actually present evidence at the hearing (billing $16,250.00) and decided to withdraw all grounds for objection, except two, which LCPI apparently claimed would be established by the absence of evidence  presented by Latshaw. Thereafter, LCPI's counsel spent another 44 hours (billing approximately $30,000.00) preparing for a confirmation hearing at which it would not be presenting evidence.

Seven Weil lawyers were involved in drafting and pursuing the confirmation objection, including LCPI's Houston litigation counsel.  Five Weil lawyers billed time in connection with the unfiled disclosure statement objection. Three lawyers appeared on behalf of LCPI at the confirmation hearing, two of whom traveled from New York and Houston.  Even putting aside the lack of merit to the objection, duplication of efforts by up to seven lawyers charging from $395 to $870 per hour also contributed to an excessive overall fee for the task. Reasonable exercise of billing judgment requires a firm to write off excessive time billed by inexperienced lawyers to compensate for the considerable learning curve required to become proficient in Chapter 11 practice, especially where such lawyers bill at rates exceeding those

---

[205](...continued)

expenses, or for the time billed in the "Credit Agreement" category for reviewing and discussing the proposed Restructured Credit Agreement (approximately $55,000.00).

charged by highly experienced local practitioners in the same case.  Again, such training is firm overhead, not an expense fairly chargeable to LCPI or Latshaw.

Moreover, LCPI's groundless objection compelled Latshaw and Ableco to respond, increasing  Latshaw's counsel fees and Ableco's § 506(b) claim.[206]  Had LCPI reasonably and appropriately analyzed Latshaw's plan and predicted the minimal benefit LCPI could have hoped to achieve by objecting to it, most of the fees incurred by LCPI, and by Latshaw and Ableco in responding, could have been avoided.  As the only issue between Latshaw and LCPI was the *amount* of LCPI's claim in light of LCPI's breach, and the plan proposed to pay that claim, once adjudicated, in full with interest, LCPI did not justify – and it is difficult to conceive of any justification for – LCPI's aggressive attempt to prevent plan confirmation.

In addition, as the Court found above, because analysis of Latshaw's proposed plan and disclosure statement did not require any special familiarity with the Lehman Bankruptcy Case or the Claims Litigation, assigning to Weil the task of addressing the plan and disclosure statement was not justified.  Reimbursement of any time reasonably spent on this issue must be at customary local rates.

"[A] bankruptcy court may, and very well should, disallow fees under § 506(b) where the creditors' actions have, in fact, unreasonably hindered the entire reorganization process."[207]  Latshaw's reorganization was hindered, and became very expensive, on account

---

[206]Ultimately, Latshaw paid Ableco $601,673.04 in satisfaction of its § 506(b) expense claim.  See Order Re Allowance of Section 506(b) Expense Claims of Ableco Finance, LLC and A3 Funding L.P. and Stipulation Re: Same (Doc. 378).

[207]In re PCH Associates, 122 B.R. 181, 205 (Bankr. S.D.N.Y. 1990), *quoting* In re
(continued...)

of LCPI's actions.  The Court concludes that a reasonable fee for addressing Latshaw's disclosure statement and plan is $30,000.00.[208]  The remainder requested by LCPI in this category is disallowed.

e.    "Credit Agreement"

In the Credit Agreement category, LCPI seeks to recover $347,249.00 for 678.4 hours of services rendered by Weil.[209]  As set forth in Section III(D)(1)(b) above, 276.4 of those hours were spent prepetition in LCPI's effort to hold Latshaw in default under the Prepetition Credit Agreement, resulting in fees of $123,937.50, and allowability of these fees has already been addressed.  In addition, $66.50 (.1 hours) has already been disallowed as administration

---

[207](...continued)
Nicfur–Cruz Realty Corp., 50 B.R. 162, 167 (Bankr. S.D.N.Y. 1985).

[208]Actions taken in this case are reminiscent of those recited in In re Brunswick Apts. of Trumbull County, Ltd., wherein the Sixth Circuit Bankruptcy Appellate Panel affirmed reduction of fees requested by an oversecured creditor who objected to confirmation of a plan.  215 B.R. 520 (B.A.P. 6th Cir. 1998).  Despite the favorable treatment in the plan, the creditor –

> filed a twelve page objection to the plan, challenging practically every element in § 1129(a) and (b).  The bankruptcy court noted that feasibility of the plan was not at issue because the plan funding was placed in escrow.  In addition, the court noted that the Bank did not pursue its objection at the hearing.  The court further found that most of this effort was unnecessary to protect the Bank's interests, was inconsistent with the Bankruptcy Code, [was] unrealistic in terms of the arguments advanced, and otherwise unreasonable. . . .  [T]he bankruptcy court included fees only for the time that would have been necessary to prepare a "no waiver" objection, and for time spent attending the hearing.  This determination was not clearly erroneous.

Id. at 524.

[209]Conner & Winters did not bill for any services in the "Credit Agreement" category.

81

of the Lehman Bankruptcy Case in Section III(D)(2)(a) herein.  The remaining 401.9 hours attributed to postpetition credit agreement work (resulting in fees of $223,245.00) can be divided into three periods:  First, the period between the filing of Latshaw's petition and confirmation of the Plan (November 11, 2009, to July 22, 2010); second, the one-month or so period following confirmation (July 22, 2010, to August 27, 2010); and third, the period thereafter (August 27, 2010, to June 30, 2011).

Services provided by Weil in the first period included numerous meetings, emails, and other "communications" between lawyers in the corporate department and lawyers in the bankruptcy department concerning the Prepetition Credit Agreement. What was being discussed and why the corporate lawyers were still involved is not clear.  Nothing in the time records justifies continuous rehashing of the terms of the Prepetition Credit Agreement, now that Latshaw was in bankruptcy.  As of the first cash collateral hearing, LCPI knew that Latshaw intended to pay LCPI's claim, to the extent allowed, in full.  In March 2010, a team of five Weil lawyers worked on a restructuring term sheet.  From May 2010 through July 2010, a team of seven Weil lawyers reviewed and discussed among themselves the proposed Restructured Credit Agreement drafted by Latshaw and Ableco's counsel (generating fees of $54,436.00).   In addition, several lawyers in Weil's corporate department read and commented on LCPI's objection to confirmation.  A few weeks before the confirmation hearing, LCPI's lawyers began drafting a new form of credit agreement and circulating it among themselves.  In the end, the Restructured Credit Agreement created by Latshaw and Ableco was approved by this Court (with minor amendments).

During this first postpetition period, Weil lawyers spent 124.1 hours on these tasks, billing $75,395.00.  The Court concludes that the majority of the services described were reactionary and/or obstructionist, rather than truly necessary to protect LCPI's interests, and were incompatible with appropriate deference to Latshaw's right to propose a plan under the Bankruptcy Code.

In the one-month period following confirmation, seven Weil lawyers and one paralegal spent 247.5 hours, and billed  $130,317.00, for services relating to closing the Restructured Credit Agreement, including the unnecessary, unwarranted, and duplicative efforts, described earlier, that obstructed the implementation of the confirmed plan and increased attorney fees incurred by Latshaw and Ableco.  LCPI did not establish that 247.5 hours of services rendered over a month's time was reasonable or necessary to protect or preserve LCPI's rights.

 During the third period, August 27, 2010, to June 30, 2011, time billed in the Credit Agreement category (30.4 hours) appears to be related to documenting an amendment to the Restructured Credit Agreement as a result of the parties' settlement, and attending to collateral issues.  For these services, LCPI seeks reimbursement of $16,418.50 in fees.

The Court concludes that a reasonable fee for reasonable post-petition services under this category is $45,000.00, and the remainder requested is disallowed.  Again, overstaffing resulted in inefficiency and multiplication of the time spent by several-fold, which should have been adjusted, but was not, by appropriate billing judgment.

f.      "Fee Application"

Weil billed 117.1 hours to prepare the First § 506(b) Application, 52.9 hours to prepare the Second § 506(b) Application, and 16.6 hours on miscellaneous matters in the "Fee Application" category, resulting in fees of $89,710.50 (186.6 hours).[210] Weil billed $1,491.00 (4.2 hours) in this category prior to Latshaw filing Chapter 11, which has been previously disallowed in Section III(D)(1)(c) herein, and $199.50 (.3 hours) previously disallowed in Section III(D)(2)(a) herein, as services rendered in administering the Lehman Bankruptcy Case, leaving for consideration fees of $88,020.00 (182.1 hours).  As detailed in the findings of fact,[211] Weil assigned too many lawyers to the task of preparing the fee application, and an unreasonable number of hours were spent by inexperienced lawyers billing at elevated hourly rates.  The Court concludes that a fee of $18,000.00 is reasonable for this, and the remainder requested is disallowed.

g.      "Non-Working Travel"

Weil's billing records include $74,696.00 for 211.0 hours of "non-working travel" time.[212]  Weil charged half its normal hourly rates for non-working travel time.  Extrapolating

---

[210]One Weil attorney billed $1,592.50 (3.5 hours) in the Claims Litigation category to review the First § 506(b) Application, which has been added to the 183.1 hours totaled at page 91 in the Weil Fee Detail.  Also, as stated above, Conner & Winters billed its fee application tasks in the General Case Administration category, and are not reflected in the hours and fees considered here.

[211]See Section II(C)(3), supra.

[212]See Weil Fee Detail at 91-92.  Charges for non-working travel do not include the expense of the travel itself (airfare, hotels, meals, ground transportation, etc.).  Conner & Winters did not bill any non-working travel time.

from the dates of the time entries, it appears that non-working time was billed for travel incurred in connection with cash collateral hearings, the confirmation hearing, a hearing on a discovery dispute, discovery in the Claims Litigation, and attending settlement conferences. Although LCPI had local counsel that could have attended to cash collateral matters and the confirmation hearing, LCPI sent one lawyer from New York to handle the cash collateral hearings, who billed $12,396.50 for non-working travel time.  Two lawyers traveled to Tulsa for the confirmation hearing at which no evidence was to be presented by LCPI (one from New York and one from Houston) and billed $8,220.00 for non-working travel time. Charging Latshaw for these lawyers' downtime while traveling unnecessarily is not reasonable.

One lawyer traveled from Houston to attend a hearing on a discovery motion, billing $2,873.00 for non-working travel time.

Travel related to discovery tasks, including preparing deponents, and taking and defending depositions, resulted in $36,633.75 charged for non-working travel.  Normally, traveling to the location of a deponent's residence would qualify as a reasonable travel expense, but in this case, Weil sent lawyers from Houston and Dallas to prepare and defend deponents, generally representatives of LCPI, in New York, raising the question of whether it is reasonable to charge Latshaw for such expense when LCPI had a team of competent and fully informed lawyers in its New York office.  The Court concludes that while LCPI was entitled to divide the tasks among lawyers as it desired, Latshaw should not bear the extra cost when the tasks could be accomplished more efficiently.

Two Weil lawyers that traveled to Tulsa for the first settlement conference, one from New York and one from Houston, billed $4,031.25 for non-working travel time. Four lawyers billed non-working travel, two from New York and two from Dallas, for the second settlement conference, billing $10,541.50.

Accordingly, the Court will allow $30,000.00 in the non-working travel category, which represents the reasonable expense incurred in connection with attending court-mandated settlement conferences and a reasonable number of hours of non-working travel for discovery purposes. The remainder billed in this category is disallowed.

h.    "Claims Litigation"

In the Claims Litigation category, Weil billed $1,617,304.50 (2,767.3 hours) and Conner & Winters billed $38,930.50 (104.5 hours), for a total of $1,656,234.50 (2,871.8 hours). Fees in the amount of $6,989.50 (9.6 hours) have already been disallowed as fees incurred in administering the Lehman Bankruptcy Case (see Section III(D)(2)(a) herein), and fees of $1,592.50 (3.5 hours) have already been considered in the Fee Application category (see Section III(D)(2)(f)), leaving $1,647,652.50 (2,858.7 hours) for consideration in this section. Included in this tally are fees for tasks detailed in the preceding findings of fact,[213] namely: (1) $36,189.50 (56 hours) to draft LCPI's objection to Latshaw's proof of claim filed in the Lehman Bankruptcy Case; (2) $41,588.00 (69 hours) to compile a reply brief regarding the same; (3) $11,686.50 (23 hours) to draft a simple proof of claim against Latshaw's estate; (4) $43,868.50 (93.8 hours) to compose a "claims litigation strategy memo;" (5) $127,340.00

---

[213]See Sections II(B)(2), II(B)(3), and II(C)(2), supra.

(253.9 hours) to draft a response to Latshaw's objection to LCPI's proof of claim; (6) $28,568.00 (61.7 hours) researching admissibility of newspaper articles; (7) $80,863.50 (135.4 hours) drafting an opposition to admission of certain conclusions in the Lehman Examiner's Report;[214] (8) $6,204.00 (13 hours) to draft a motion for continuance; (9) $83,610.00 (92.9 hours) incurred by substitute lead counsel to prepare for trial after lead counsel developed a conflict; (10) $37,943.50 (71.6 hours) to draft a motion in limine, (11) $2,511.00 billed by six lawyers simply to read Latshaw's response, (12) $16,410.00 (24.7 hours) to formulate a reply; and (13) at least $37,000.00 in connection with documenting the settlement of the Claims Litigation, including approximately $12,500.00 (16 hours) to review and revise the settlement agreement, and almost $20,000.00 (36.5 hours) to draft and file a Bankruptcy Rule 9019 motion in the Lehman Bankruptcy Case.

These few discrete tasks add up to $553,782.50 in fees (in excess of 947.5 hours), which is indicative of the excessive time devoted to not especially complicated tasks, and the effect of overstaffing and overlawyering.  Only a handful of pleadings were filed in connection with the Claims Litigation, but three or four or five or six lawyers billed for drafting these pleadings, and even more billed for discussing them and reviewing them.

The remaining $1,093,870.00 (1,911.2 hours) not itemized above reflects time expended in attending one or two in-court hearings and a couple of telephonic hearings, conducting discovery (LCPI deposed two witnesses; Latshaw deposed three), attending two settlement conferences, and preparing for trial.  Significantly, the $1.647 million incurred in

---

[214]This figure includes $5,500 (13.9 hours) billed by Conner & Winters.

Claims Litigation does not include any time actually trying the case, as the claim was settled on the eve of trial.

LCPI's post-effective date fees, which were almost solely incurred in connection with the Claims Litigation, totaled $1,237,301.75 in fees (2,260.7 hours).[215]  During the same period, Latshaw incurred fees of $510,321.75 (1,558.6 hours), but those fees represent services rendered for, in addition to the Claims Litigation, other post-confirmation tasks, such obtaining approval of administrative expense claims for all its professionals, objecting to and resolving objections to unrelated proofs of claim, preparing and filing post-confirmation operating reports, and resolving an ad valorem tax claim.[216]

The Court concludes that a reasonable fee for services under this category is $460,000.00, and the remainder is disallowed.

### 3.   *Summary of Allowed Fees*

In summary, fees in the amount of $660,500.00 are allowed, and the balance requested is disallowed.  This figure represents approximately 25% of LCPI's request, which is consistent with the findings that LCPI's professionals multiplied efforts by a factor of at least four.  To the extent that the issues were more complex or more professionals were needed due to the existence of the Lehman Bankruptcy Case, LCPI must absorb the cost of complexity; Latshaw played no role in Lehman's epic downfall.  This matter was grossly "overlawyered," and the costs of the extraordinary efforts expended by LCPI – first to defeat Latshaw's rights

---

[215]Some time was spent in the Fee Application category, however.

[216]See Comparison of Work by Debtors' Counsel & LCPI Counsel, Latshaw Exhibit 15, at 1.

under the Prepetition Credit Agreement, and then to deny Latshaw a fair opportunity to restructure the accelerated loan under Chapter 11 – must be borne by LCPI.[217]

    E.    <u>Allowed Expenses</u>

        *1.    LCPI's Out-of-Pocket Expenses*

LCPI requests reimbursement for out-of-pocket expenses incurred (1) by LCPI representatives traveling from New York to Tulsa for the June 2009 meeting with Latshaw regarding LCPI's proposed restructuring proposal and for two postpetition mediation sessions ($10,165.60) and (2) in retaining Superior Asset Appraisals to perform a "desktop appraisal" of certain of Latshaw's equipment in connection with Latshaw's use of cash collateral ($5,000.00).[218]

One LCPI representative who attended the June 2009 meeting submitted an expense report that included meals on days he worked late in March 2009 through June 2009, but LCPI did not present evidence that these meals were related to travel or related to the Latshaw loan.[219]  These expenses are disallowed in the amount of $114.96.

---

[217]See <u>Praseuth v. Rubbermaid, Inc.</u>, 406 F.3d 1245 (10th Cir. 2005); <u>In re 900 Corp.</u>, 327 B.R. 585, 593 (Bankr. N.D. Tex. 2005) (creditor may not shift the cost of "overlawyering" to the debtor's estate); <u>In re Cummins Utility, L.P.</u>, 279 B.R. 195, 209 (Bankr. N.D. Tex. 2002) (court awarded approximately 10% of requested fees, finding creditor's request "overreaching," in light of "fail[ure] to exercise reasonable discretion in the use of professionals," seeking fees for services that were "blatantly unnecessary" and "served as a placebo for a nervous bank officer").

[218]Second § 506(b) Application (Doc. 491) at 11-12.

[219]<u>Id</u>. at 153.

The Court concludes that $15,050.64 was reasonably expended for the enforcement and preservation of LCPI's rights, and the remainder is disallowed.

### 2. *Weil's Expenses*

LCPI requests reimbursement of expenses incurred by Weil in the amount of $137,416.44, summarily categorized as follows:[220]

| | |
|---|---|
| Travel and Transportation | $42,121.23 |
| Business Meals | $3,403.02 |
| Telephone / Facsimile | $144.31 |
| Postage and Express Mail | $2,162.01 |
| Duplicating | $25,007.44 |
| Consultants / Witness Fees | $7,664.40 |
| Corporation Service | $1,232.60 |
| Messenger / Process Service | $350.79 |
| Court Reporting | $7,798.35 |
| Computerized Research  / Other Research | $47,532.29 |
| TOTAL: | $137,416.44 |

Shortly prior to the hearing on LCPI's § 506(b) Application, LCPI filed a pleading that included a chart itemizing each individual expense.[221]  Expenses are not listed chronologically, however, nor are all the expenses in a particular category listed sequentially, making it a

---

[220]Id. at 20.

[221]A table identifying Weil's expenses by date, professional, amount, and in some cases, an explanatory comment ("Weil Expense Detail") was attached to LCPI's Response to Objections to Amended and Supplemental Application for Allowance of Claim of Lehman Commercial Paper Inc. for Interest, Fees, and Expenses Under § 506(b) of the Bankruptcy Code (Doc. 500) filed on December 9, 2011.

challenge to determine whether any particular expense was necessary or reasonable.  In order to fairly evaluate Weil's expenses, the Court created its own chart, placing reported expenses in each category in chronological order, which, of course, was not the Court's responsibility, as LCPI has the burden of establishing the reasonableness of its expense request.  That effort, however, allowed the Court to muster the following findings and conclusions:

a.      Travel and Transportation Expenses of $42,121.23

Aggregating all expenses identified as airfare, agency fees, hotels, meals, parking, and ground transportation produced a total of $38,386.83[222] in out-of-town travel expenses.  Local transportation expenses not related to out-of-town travel (taxis and car services) totaled

---

[222]Weil Expense Detail at 4-38, 52-68.  This figure includes the following:  $1,597.26 for one New York attorney to travel to Tulsa for the first cash collateral hearing; $1,910.88 for one New York attorney to travel to Tulsa for the second cash collateral hearing; $1,936.07 for one New York attorney to travel to Tulsa for the third cash collateral hearing; $1,594.12 for one New York attorney to travel to Tulsa for the first settlement conference (two attorneys attended; travel expenses for one were apparently waived, but LCPI does seek to recover fees for that attorney's Non-working Travel in excess of $2,500.00); $2,019.85 for one New York attorney to travel to Tulsa for the confirmation hearing (again, two attorneys attended, and both billed Non-working Travel time, but the application seeks expenses for only one attorney); $1,761.28 for one New York attorney to travel to Tulsa for the hearing on the motion regarding use of examiner's report (again, two attorneys billed Non-working Travel time, but only one attorney's travel expenses are requested); $659.92 for one Dallas attorney to travel to Tulsa for the deposition of Trent Latshaw (again, two attorneys billed time for Non-working Travel); $5,835.77 for one Houston attorney and one Dallas attorney to travel to New York to prepare LCPI representatives for deposition; $6,301.02 for two Dallas attorneys to travel to New York for depositions of LCPI representatives; $7,712.00 for two Dallas attorneys to travel to New York to defend depositions of LCPI representatives (another attorney charged "conference meals" and fees for Non-working Travel in connection therewith, but not other travel expenses); $495.36 for one Dallas attorney to travel to Tulsa to meet with an oil rig consultant; $7,070.89 for two Dallas attorneys to travel to New York to depose Latshaw's financial expert; $5,298.18 for two New York attorneys and three Dallas attorneys to travel to Tulsa to attend a settlement conference and pretrial hearing.

$410.93.[223]  The Court notes that the amount LCPI requests for travel expenses, $42,121.23, is $3,323.47 more than the sum of two travel components set forth above.  LCPI provided no explanation for the difference, and thus $3,323.47 is automatically disallowed.[224]

With respect to Weil's local travel expenses, Weil had a policy of charging clients for their professionals' transportation from the office to their home by taxi service if the professional worked past 8:30 p.m.[225]  However, Weil's time sheets indicate that some lawyers who charged taxi service expenses to LCPI did not work extensively that day on the Latshaw matter.  For example, the first entry for "Local Transportation" is for November 11, 2009, and the professional that was reimbursed for taxi fare billed LCPI for only .2 hours that day.  On November 12, 13, 15, 16, and 17, the same professional billed LCPI for 4.0, 2.2, 5.0, 5.6 and 2.2 hours, respectively, and obtained reimbursement from LCPI for taxi fare home.  Another example is September 29, 2009, where a lawyer billed only .6 hours of time to LCPI, and charged LCPI $81.94 for transportation home.  In addition, that lawyer left before 8:30 p.m., obtaining reimbursement for such transportation in violation of Weil's policy.[226]

Without evidence of special circumstances, it is not reasonable to impose the cost of a professional's transportation to and from the office upon a client (or the client's indemnitor)

---

[223]Weil Expense Detail at 1-4, 37-38, 68.

[224]In several expense categories, the amount sought by LCPI (*i.e.*, the figures set forth in the Second § 506(b) Application at 20) exceeds the sum of the individual itemized entries contained in the Weil Expense Detail.  In such cases, the excess is automatically disallowed without further comment.

[225]See Testimony of J. Marcus, Tr. 12/13/11 at 82.

[226]Id.

simply because the attorney chose to work on that client's matter after normal working hours. Reimbursement of local transportation costs, totaling $410.93, will be disallowed.

With respect to air travel, Weil has a "travel department" that makes reservations for its professionals.[227]   LCPI did not present any evidence that the travel department made any effort to obtain the best fares for air travel between New York and Tulsa, Houston and Tulsa, or Dallas and New York, and indeed airfare to and from New York greatly exceeded the airfare obtained by Latshaw's New York counsel.[228]   In addition to high fares, Weil charged LCPI an "agency fee" of $39 or $40 per ticket, which increased the cost air travel by $78 to $80 per trip. Moreover, as stated above, Weil lawyers in Dallas flew to New York on numerous occasions to prepare LCPI representatives for depositions, and to defend those depositions, even though Weil lawyers located in New York were fully capable of assuming that task.[229]

The Court will allow $15,000.00 as reasonable out-of-town travel expenses, with the remainder disallowed.

> b.   Business Meal Expenses of $3,403.02

Meal expenses incurred *while traveling* have already been addressed in the Travel and Transportation category above.   Other business meals Weil charged to LCPI appear to be meals consumed by Weil personnel while working in the office, presumably while working overtime,

---

[227]Id. at 83.

[228]Id. at 84.   Latshaw's New York lawyer flew to Tulsa and back for $439, while LCPI's New York lawyers' round trip fares to Tulsa ranged from approximately $1,100 to $1,700.   LCPI's Dallas lawyers' round trip fares to New York ranged from approximately $1,900 to $2,250.

[229]Id. at 83-84.

and these meal expenses total $589.82.[230]  Again, some of the meals were charged on days

when the professional did not work on the Latshaw matter extensively, and therefore neither

LPCI nor Latshaw should be charged for overtime meals.  All expenses in this category are

disallowed.

c.      Telephone and Facsimile Expenses of $144.31

LCPI seeks $144.31 for Weil's telephone and facsimile charges.  Of that amount,

$124.95 is characterized as "International Mobile Phone Data Expenses" incurred in August

2010[231] without any explanation as to why international mobile phone charges were necessary.

These expenses are disallowed.  The remaining $19.36 in telephone and facsimile charges[232]

is allowed as reasonable.

d.      Postage and Express Mail Expenses of $2,162.01

LCPI seeks $2,162.01 for Postage and Express Mail charges incurred by Weil.  In

Weil's Expense Detail, the Court located express mail charges totaling only $2,098.08,[233] and

therefore assumed that the difference of $63.93 would consist of regular postage expenses.

---

[230]See Weil Expense Detail at 38-39, 68-70.  It appears that Weil included expenses
incurred for meals purchased while traveling in both its Travel and Transportation expense
request and its Business Meals expense request.

[231]See Weil Expense Detail at 51.

[232]See Weil Expense Detail at 52, 116.

[233]See Weil Expense Detail at 70-88.

However, the Court located only $9.90 in expenses described as postage.[234]  Of the $63.93, the Court will allow $9.90, and disallow the remainder.

Of the express mail charges ($2,098.08), $34.09 was charged to express mail something to Milbank, Tweed, Hadley & McCoy (counsel to the Committee representing Lehman's unsecured creditors) in Washington DC;[235] these charges are related to the communication by Lehman, as a debtor-in-possession, with its own creditors, which constitutes administration of the Lehman estate – unnecessary to the enforcement of its rights against Latshaw–and thus such expenses are disallowed.  Charges for express mailing documents to counsel for Latshaw totaled $182.41,[236] which the Court assumes were responses to document requests, and these expenses will be allowed.  The remaining express mail charges, totaling $1,881.58, are described as shipments between Weil's offices in New York and Weil's offices in Dallas, which was necessary only because Weil assigned the Claims Litigation portion of its representation to lawyers located in Houston and Dallas.  This expense should be borne by Weil as overhead, or by LCPI as a consequence of unreasonably multiplying the number and location of professionals employed to represent it in the Latshaw matter.

---

[234]See Weil Expense Detail at 39-40.

[235]See Weil Expense Detail at 76, 80.

[236]See Weil Expense Detail at 70-71, 77, 79.

The Court concludes that $182.41 of express mail charges and $9.90 of postage charges were reasonably incurred, and will be allowed, and the remainder requested in this category is disallowed.[237]

e.    Messenger and Process Service Expenses of $350.79

Weil incurred expenses of $350.79 for employing On Time Couriers, Inc. and Deluxe Delivery Systems,[238] but LCPI provided no explanation as to why couriers were needed, and therefore the Court cannot determine whether the expenses were reasonable or necessary. These expenses are disallowed in full.

f.    Duplicating Expenses of $25,007.44

The Court recognizes that the discovery in the Claims Litigation was document-intensive.  Weil charged $.10 per page to make regular photocopies in-house, for which LCPI seeks reimbursement of $10,311.50,[239] and $.50 per page to make color copies in-house, for which LCPI seeks reimbursement of $247.50.[240]  Weil also obtained outside photocopying services from Merrill Communications LLC, who charged Weil $.12 per page.  LCPI seeks reimbursement at $.10 per page, however, for a total of $9,089.26.[241]  Weil also lists expenses

---

[237]On April 5, 2011, after the Claims Litigation was settled, Weil's New York office shipped fifteen boxes of documents to Weil's Dallas office, for a total charge of approximately $600.00.

[238]See Weil Expense Detail at 46-48.

[239]See Weil Expense Detail at 40-43.

[240]See Weil Expense Detail at 116-17.

[241]See Weil Expense Detail at 43-44.

of $82.95 to obtain unidentified documents from outside sources,[242] and expenses of $332.00

for in-house "binding."[243] These duplication expenses will be allowed.

Weil also charged LCPI $.10 per page for in-house "printing" of documents

(presumably from a digital source) for a total of $3,991.20,[244] and $.10 per page for "scanning"

documents for a total of $623.50.[245] "Scanning" and "printing" are expenses in the nature of

overhead, and thus, those charges will be disallowed.

Weil also charged LCPI $320.00 to duplicate two CD/DVD's in-house,[246] which is not

comparable with commercial duplication services, and thus only $50.00 will be allowed as

reasonable.

Overall, duplication expenses in the amount of $20,113.21 are allowed, and the

remainder requested is disallowed.

g.      Consultants and Witness Fees of $7,664.40

Theses fees were paid by Weil to an entity identified only as M.E.L. Valuations for

"Expert Fees re Accounting of Various Rig Parts" and "Consult-Latshaw Drilling Fees for

Finalizing Report and Research."[247]  The Court infers from testimony at the hearing that these

expert fees were incurred in the Claims Litigation in order to assess the value of rig parts that

---

[242]See Weil Expense Detail at 51-52.

[243]See Weil Expense Detail at 50-51.

[244]See Weil Expense Detail at 88-92.

[245]See Weil Expense Detail at 92-94.

[246]See Weil Expense Detail at 94.

[247]See Weil Expense Detail at 45.

Latshaw claimed to have purchased in reliance on LCPI's broken commitment to extend credit to build additional rigs, which alleged futile expenditure Latshaw included in its $18 million damages claim.[248]   LCPI was entitled to obtain expert assistance to defend the claim; accordingly, the Court concludes that these expenses were reasonably and necessarily incurred and are allowed.

h.      Corporation Service Expenses of $1,232.60

LCPI seeks reimbursement of $1,232.60 paid for services rendered by Corporation Service Company apparently related to lien searches and filing fees.[249]   The dates of such services suggest that searches or filings were made prepetition near the dates that LCPI declared defaults and accelerated Latshaw's note, on the day after Latshaw filed its Chapter 11 petition, and shortly after confirmation of the Plan.  These expenses are allowed.

i.      Court Reporting Expenses of $7,798.35 [250]

Weil obtained certified transcripts of the depositions of Trent Latshaw, H. Liao, Eric Salzman, T. Keresztes (Latshaw's expert witness), and one other unidentified deponent, which resulted in expenses of $6,308.35.   In addition, Weil paid a videographer $1,490.00 to videotape the depositions of Trent Latshaw and Mr. Keresztes.   LCPI did not present any evidence as to why videotaping the depositions of Mssrs. Latshaw and Keresztes was necessary; it would be reasonable to assume that, as Latshaw's main witnesses, they would be

---

[248]See Tr. 12/13/11 at 77-78.

[249]See Weil Expense Detail at 45-46.

[250]See Weil Expense Detail at 48-49.

appearing in person at trial.  Absent some justification for videotaping the depositions, the Court finds such expense unnecessary and unreasonable.

Accordingly, the Court will allow the expense of the transcripts in the amount of $6,308.35, and disallow the videographer expense in the amount of $1,490.00.

> j.   Computerized Research Expenses of $47,532.29

Included in the Computerized Research category are Westlaw, LEXIS,[251] and PACER[252] expenses.  PACER charges totaled $461.92 and are allowed.

Westlaw and LEXIS charges totaled $47,070.37.  However, Weil provided an explanation for the purpose of electronic research for only a handful of the Westlaw and LEXIS sessions charged; the cost for those sessions totaled $19,138.21, which still seems excessive, but will be allowed.  The remaining expenses set forth in the Computerized Research category are disallowed.

> 3.   *Conner & Winters' Expenses*

LCPI requests reimbursement of expenses incurred by Conner & Winters in the total amount of $3,819.98,[253] allocated into the following categories:

| | |
|---|---|
| Filing / Recording Fees | $551.00 |
| Telephone | $3.60 |
| Transcript | $702.25 |

---

[251]See Weil Expense Detail at 94-116.

[252]See Weil Expense Detail at 49-50, 95, 96, 100, 107.

[253]Second § 506(b) Application at 11.

| | |
|---|---|
| Photocopies | $1,439.70 |
| Postage | $219.16 |
| Professional Service | $19.40 |
| PACER | $73.52 |
| Fed-X | $811.35 |
| TOTAL: | $3,819.98 |

Other than the summary, LCPI presented documentary evidence of Conner & Winters' expenses for only four of these categories: Filing fees, photocopies, PACER, and Fed-X.

Filing fees consist of seven *pro hac vice* fees for the seven Weil lawyers that entered an appearance in this case, totaling $525.00, and a $26.00 fee to obtain a CD of a hearing.[254] The Court will allow *pro hac vice* fees for four lawyers and the fee for the CD, for a total of $326.00 in the Filing/Recording Fees category, and the remainder is disallowed.

The documentation reflects that Conner & Winters charged $2,760.15 for 18,401 pages of in-house photocopying ($.15 per page), but LCPI requests reimbursement of only $1,439.70 (approximately $.08 per page).[255] The Court will allow photocopying expenses in the amount of $1,439.70.

LCPI presented a running list of PACER charges incurred by Conner & Winters for two time periods, and these total $2,589.68. However, LCPI requests reimbursement of only $73.52 in this category, which appears reasonable, and will be allowed.

---

[254]*See* Documentation of Expenses, LCPI Exhibit 17.

[255]*Id.*

On April 1, 2011, Conner & Winters incurred a total of $687.82 in Fed-X charges to ship fourteen boxes from Tulsa to Weil's New York office, which boxes arrived in New York on April 4, 2011.[256] These appear to be the same fourteen boxes that were shipped by Weil in New York to Weil in Dallas on April 5, 2011.[257] Although the Court disallowed the Weil-to-Weil shipment as overhead, the cost of shipping documents from Tulsa (where there parties were preparing for trial) back to Weil after the matter was settled appears reasonable and necessary. Thus, these Fed-X charges will be allowed.

In addition, on March 29, 2011, Conner & Winters incurred an additional $123.53 to ship two additional boxes from Tulsa to Weil in New York. This charge also appears reasonable and is allowed.

Although LCPI did not provide any receipts or other evidence, or an explanation, regarding the necessity or reasonableness of expenses in the other categories (Telephone - $3.60, Postage - $219.16, and Professional Service - $19.40), the Court will allow such *de minimis* expenses as reasonable in light of the tasks accomplished by local counsel.

In addition, although LCPI did not provide any receipts or explanation with respect to the request for reimbursement of Transcript expenses, a review of the docket sheet in this case indicates that Conner & Winters ordered transcripts of three hearings held herein, the cost of which totaled $702.25.[258] Therefore, the Court will allow that expense.

---

[256] Id.

[257] See Weil Expense Detail at 84-88.

[258] See Docs. 65, 66, 332.

101

### 4. Summary of Allowed Expenses

To recap, reimbursement of $88,775.98 – consisting of (1) LCPI's direct expenses in the amount of $15,050.64, (2) expenses incurred by Weil in the amount of $70,130.36, and (3) expenses incurred by Conner & Winters in the amount of $3,594.98 – is allowed. All other expenses requested are disallowed.

## IV. CONCLUSION

LCPI's Application is granted in part and denied in part. LCPI is entitled, under § 506(b), to a secured claim in the amount of $749,275.98.[259] The balance of LCPI's claim is disallowed as a secured claim under § 506(b) and disallowed as an unsecured claim under § 502(b)(1). A judgment consistent with this Memorandum Opinion shall be entered contemporaneously herewith.

**SO ORDERED** this 12th day of October, 2012.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

---

[259]This figure is the sum of allowed fees of $660,500.00 and allowed expenses of $88,775.98.

102